**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAWN ANGELIQUE RICHARD,<br><br>    Plaintiff,<br>  v.<br><br>SEAN COMBS, HARVE PIERRE, JANICE COMBS PUBLISHING LLC, JANICE COMBS PUBLISHING HOLDINGS INC, LOVE RECORDS INC, DOE CORPORATIONS  1-10, AND DOE DEFENDANTS 11-20,<br><br>    Defendants. | Civil Action No. 24-cv-06848-KPF<br><br>**SECOND AMENDED COMPLAINT**<br><br>Hon. Katherine Polk Failla<br><br><br>Jury Trial Demanded |

Plaintiff Dawn Angelique Richard ("Ms. Richard" or "Plaintiff"), by and through her attorneys, The Bloom Firm and IP Legal Studio LLC, brings this action against Defendants.  Ms. Richard alleges upon knowledge concerning her own experience and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.      Dawn Angelique Richard**,** known professionally as Dawn Richard, is an American musician, singer, songwriter and performer since 2000, who is unique to the electronic dance music genre, incorporating hip-hop, rhythm and blues and pop music, and forming emotionally atmospheric sounds. Ms. Richard first gained widespread recognition as a member of the girl group *Danity Kane* formed by Defendant Sean Combs ("Mr. Combs"), and later transitioned into a key member of the band *Diddy – Dirty Money.*

2.      Defendant Sean Combs, a once-celebrated hip-hop mogul popularly known by his stage names Puff Daddy, Puffy, P. Diddy, Diddy, and Love, skyrocketed to fame in the late 1990s and became a powerful and enduring figure in the music and entertainment industry. In 1998, Mr. Combs explained the origins of his stage name in a *USA Today* interview: his nickname was "Puff" because he had a **"temper"** and was known to "huff and puff" when he was angry.

3.      Over the decades following his rise to fame, Mr. Combs' star-studded, larger-than-life persona overshadowed his vicious temper and pervasive acts of violence directed towards those in his inner circle – specifically, women.

4.      Mr. Combs' namesake temper frequently manifested in physical violence. Mr. Combs regularly hurled objects in fits of rage, often throwing items such as mobile phones, laptops, food, and studio equipment across the room or at people. On numerous occasions, Ms. Richard witnessed Mr. Combs brutally beat his girlfriend, Ms. Casandra ("Cassie") Ventura ("Ms. Ventura"). His persistent abuse included choking and strangling Ms. Ventura, striking her with his hands and with objects, slapping her, punching her, and throwing items at her.

5.      On many occasions, Ms. Richard tried to intervene, offering Ms. Ventura support and encouragement to leave Mr. Combs. Each time, Mr. Combs learned of her efforts to help Ms. Ventura and became enraged, threatening Ms. Richard's life with statements such as **"you want to die today," "I make n***** go missing"** and **"I end people**."

6.    Compounding Mr. Combs' violent acts and death threats, he flagrantly exploited Ms. Richard's musical talent as a singer and writer while withholding her rightful earnings, stealing her copyrighted works, and subjecting her to years of inhumane working conditions which included groping, assault and false imprisonment, among other violations.

7.    For nearly a decade, Mr. Combs manipulated Ms. Richard by repeatedly threatening that her submission to his depraved demands was necessary for career advancement, instilling in her the belief that enduring such abuse and exploitation were requirements for female artists' success in the music industry. It was not until Ms. Ventura's bravery in demanding justice that Ms. Richard realized that the magnitude of her own personal suffering was tied to the many years of abuse by Mr. Combs that had become normalized for her.

8.    As more women courageously come forward, Plaintiff has been empowered by this collective strength and now adds her voice to the growing chorus of victims bravely sharing their harrowing stories. Together, they seek justice and stand in solidarity, as the latest victims of the *#Me Too* movement in the music industry.

## PARTIES

9.    At all relevant times herein, Plaintiff Dawn Angelique Richard was/is a resident of the States of California and New York.

10.    Defendant Sean Combs is a well-known recording artist, record producer, and entrepreneur. Upon information and belief, Mr. Combs resides within the States of California, New York and Florida. Combs does business regularly in the States of New York, California and Florida. As part of his renowned Bad Boy record label and brand, Combs established several entities over multiple decades, including but not limited to Bad Boy Entertainment LLC ("Bad Boy Entertainment"). On information and belief, at all relevant times, Combs owned and/or controlled these companies. As the CEO of his companies, Combs' role combined his duties as an artist, producer, promoter, and executive. Upon information and belief, Combs' duties as CEO

included founding, building, and promoting the Bad Boy brand, managing and supervising executives, managers, and staff, overseeing business strategy, producing music, and identifying and employing talent such as Plaintiff. At all relevant times, Mr. Combs met the definition of an "employer" of Ms. Richard under all relevant statutes.

11.     Mr. Combs is presently incarcerated within the Metropolitan Detention Center in Brooklyn, New York. Mr. Combs has been convicted of two counts of Transportation to Engage in Prostitution before Judge Arun Subramanian in *United States v. Combs*, Case No. 1:24-cr-00542 (AS). Combs' sentence is pending.

12.     Defendant Harve Pierre ("Mr. Pierre"), upon information and belief, resides within the state of New Jersey. At all times relevant herein, Mr. Pierre was the president of Combs-owned companies including Bad Boy Entertainment in New York and met the definition of an "employer" of Ms. Richard under all relevant statutes.

13.     Defendant Janice Combs Publishing LLC [1] is a music publishing administrator and a New York corporation, who, on information and belief, at all relevant times, held or holds the publishing copyrights of Ms. Richard pursuant to her employment with other defendants herein under all relevant statutes.

14.     Defendant Janice Combs Publishing Holdings Inc. is a music publishing administrator, a New York corporation, and on information and belief, is a successor in interest to Janice Combs Publishing LLC, who at all relevant times, held or holds the publishing copyrights of Ms. Richard pursuant to her employment with other defendants herein under all relevant statutes.

15.     Defendant Love Records Inc. is a music record label owned and/or, upon information and belief, controlled by Mr. Combs, who is believed to be its CEO, with its principal

---

[1]  Plaintiff's Complaint filed 09/10/24 (Dkt. 2) identified this defendant as Janice Combs Publishing Inc.

places of business in Delaware and Florida, but also doing business in California. Ms. Richard conferred a benefit on this Defendant pursuant to the direction of Mr. Combs in 2023.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, as this action asserts violations of 18 U.S.C. § 1591 *et seq*., 18 U.S.C. § 1589 *et seq*., and 17 U.S.C. § 106 *et seq*., and therefore raises federal questions regarding the deprivation of Ms. Richard's rights. The Court has supplemental jurisdiction over Ms. Richard's related claims arising under state and city law pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District, and each Defendant conducts substantial business and/or is domiciled in this District.

## FACTUAL ALLEGATIONS

### Mr. Combs Selects Ms. Richard to be in the All-Female Musical Group *Danity Kane* on MTV's *Making The Band* Competition

18.     In or around 2004, Ms. Richard was selected to participate in Season 3 of MTV Networks' reality television show, *Making The Band.* The show centered around the formation and development of a new musical group under the mentorship of Mr. Combs.

19.     The contestants would compete and be chosen by Mr. Combs to form a band, which would go on to write and record music for singles and albums and perform on the show and on live tours.

20.     For aspiring artists like Ms. Richard, *Making The Band* represented a tangible path to a career in the entertainment industry. As a part of both of the *Danity Kane* and *Diddy – Dirty*

*Money* bands, Ms. Richard appeared in Seasons 3 and 4 of *Making The Band*, which first aired in 2005,[2] continuing through 2008, and in Season 5 of *Making The Band*, which aired in 2009.[3]

21.     Out of thousands of contestants, five women, including Ms. Richard, were ultimately chosen to be in the group *Danity Kane*, which was named by Ms. Richard.

22.     Prior to and including the first *Danity Kane* album, *Making The Band* was filmed at various locations in New York City, but primarily at the studio known as Daddy's House at 3120 W. 44th Street, New York, New York. Some scenes and episodes were also filmed in Los Angeles and Miami. The *Making The Band* content that focused on *Danity Kane*'s work on its second album, *Welcome to the Dollhouse*, was filmed at Daddy's House and at Mr. Combs' Miami residence.  Other *Making The Band* episodes included Los Angeles as a third filming location.

23.     Upon information and belief, to create *Making The Band*, camera crews filmed 24 hours a day, gathering months' worth of footage to condense into mere hours of entertainment for viewers.

24.     *Danity Kane* released its self-titled debut album in August 2006 and its second album *Welcome to the Dollhouse* in March 2008.

25.     *Danity Kane's* first album sold over 4,000,000 copies with damages to Ms. Richard for unpaid salaries estimated at $1,000,000.00; *Danity Kane's* second album *Welcome to the Dollhouse* sold over 2,000,000 copies with damages to Ms. Richard for unpaid salaries and royalties estimated at $500,000.00.  Damages on unpaid wages for touring and promotions on over 100 dates for Ms. Richard with *Danity Kane* are estimated at $1,800,000.00.

---

[2] *Making The Band* is a reality television series that premiered on MTV in 2000. The show has had several iterations, each featuring a different musical group. The stars of Season 3 and 4 were Aubrey O'Day, Wanita "D. Woods" Woodgett, Shannon Bex, Aundrea Fimbres, and Ms. Richard, who formed the all-female group *Danity Kane.*
[3] Season 5 of *Making The Band* featured *Diddy – Dirty Money*, a trio consisting of Mr. Combs, Witness 1, and Ms. Richard.

26.    Mr. Combs fired bandmate Aubrey O'Day and Wanita "D. Woods" Woodgett from *Danity Kane* on live television at the height of its fame in 2008, which resulted in *Danity Kane* being disbanded in 2009.

**Ms. Richard First Encounters Mr. Combs' Aggressive, Intimidating Behavior and Animus toward Women**

27.    During the auditions and on the set of *Making The Band*, Mr. Combs projected an aura of superiority, wealth and power. Mr. Combs regularly wore sunglasses and avoided looking the female contestants in the eyes, contributing to an atmosphere of uncertainty and intimidation.

28.    During auditions, Mr. Combs spoke to the female contestants in a hostile, condescending manner, making disparaging gender-based remarks such as calling them **"fat," "ugly," "bitches,"** and **"hoes."** Ms. Richard felt threatened and intimidated by Mr. Combs' blatant disdain for the young women, like herself, who were excited for the opportunity to be on his show.

29.    Once the band was made, Mr. Combs' contempt for women was readily apparent as he continued to display aggressive and hostile behavior towards Ms. Richard and her all-female *Danity Kane* bandmates. Mr. Combs frequently referred to the five women as "**bitches**" and "**hoes**" and denigrated their physical appearances. For instance, Mr. Combs stated that Ms. Richard was too skinny and needed to **"do something about this** [her face].**"**

30.    On one occasion in or around 2005, during the first season of *Making The Band 3*, Ms. Richard observed Mr. Combs' ex-partner and the mother of three of his children, Kim Porter, leaving Mr. Combs' recording studio in tears with visible facial injuries including a lacerated lip. Realizing that Mr. Combs was capable of committing acts of violence against women caused Ms. Richard to feel deep apprehension and fear that Mr. Combs could one day physically harm her.

31.    Ms. Richard was present when Mr. Combs was introduced to Ms. Ventura for the first time, in or around 2006. The moment Mr. Combs first saw Ms. Ventura, his demeanor

noticeably shifted. Mr. Combs positioned himself directly in front of Ms. Ventura's seat, invading her personal space, and fixated on her with an intense, unyielding stare, isolating her from the other people in the room including Ms. Ventura's then-boyfriend, music producer Ryan Leslie.

32.    Coincidentally, this first meeting between Mr. Combs and Ms. Ventura was the first time that Ms. Richard was in Mr. Combs' presence without a camera crew filming. Observing Mr. Combs behave in such an intimidating, predatory manner the first time that they were off camera made Ms. Richard feel deeply apprehensive and afraid of him.

33.    Subsequently, Ms. Ventura ended her relationship with Mr. Leslie and began dating Mr. Combs, who would become violent and abusive toward her for many years.

### *Danity Kane*: Sexual Harassment, Inhumane Treatment, and Denial of Basic Needs by Mr. Combs

34.    For the majority of Ms. Richard's tenure as a member of both *Danity Kane* and *Diddy – Dirty Money*, Mr. Combs required her to remain at his various residences and studios in New York, Los Angeles, Florida, and New Jersey for activities such as recording, rehearsing, performing, dressing, preparing costumes and exercising.

35.    Throughout the productions of *Making the Band* 3 and 4, Mr. Combs deprived Ms. Richard and her *Danity Kane* bandmates of basic needs such as adequate food and sleep. When Ms. Richard or other *Danity Kane* members requested meals or rest, Mr. Combs refused and chastised them with derogatory comments like **"you bitches don't want this"** or **"y'all are not hungry enough"** and **"I'm paying you bitches to work."** This demeaning behavior gradually undermined Ms. Richard's confidence and contributed significantly to her growing feelings of insecurity and fear of reprisal from Mr. Combs.

36.    Upon information and belief, Mr. Combs would regularly be awake for prolonged periods of time because he was high on drugs. During these periods, Mr. Combs demanded continuous access to Ms. Richard and the other *Danity Kane* members, often forcing them to

record and rehearse for stretches of 36 to 48 hours without breaks. Forced to choose between eating and sleeping, Ms. Richard lost a significant amount of weight, weighing approximately 100 pounds at a height of 5'4". Ms. Richard began to normalize these extreme conditions and perceive them as standard requirements of her participation in *Danity Kane*.

37.     Mr. Combs routinely insisted that Ms. Richard and the other *Danity Kane* members be woken up in the overnight hours so he could watch them rehearse. Typically, Bad Boy Entertainment President Mr. Pierre communicated Mr. Combs' directives to the MTV film crew, who then entered and filmed Ms. Richard and the other *Danity Kane* members as they were awoken. The regularity of these disturbances led Ms. Richard to adapt by sleeping in a sitting position, fully dressed and with makeup on, heightening her anxiety. Over time, this abnormal sleeping arrangement came to feel routine, further normalizing Mr. Combs' invasive demands.

38.     In addition to exhausting rehearsals, Mr. Combs required Ms. Richard and her bandmates to participate in intense workouts with a personal trainer. On one occasion, while running on the beach, Ms. Richard became so dehydrated that she vomited. Instead of offering medical assistance, MTV Networks' camera crew filmed the incident – contributing to her acceptance of such treatment as part of her professional life.

39.     As the president of Bad Boy Entertainment, Mr. Pierre was present on a constant basis and regularly witnessed the extreme conditions that Mr. Combs imposed on Ms. Richard and the other *Danity Kane* members. On numerous occasions, Ms. Richard and other *Danity Kane* members complained about their starvation and physical exhaustion to Mr. Pierre and implored him to intervene with Mr. Combs.

40.     Occasionally, Mr. Pierre agreed to speak with Mr. Combs on their behalf. Subsequently, on those occasions, Mr. Pierre returned and informed them that they needed to follow Mr. Combs' orders.

41.     In response to their pleas for help, Mr. Pierre routinely echoed Mr. Combs, making statements such as **"You need to do what you're told," "We need to see records being sold," "You are always complaining," "You should be grateful,"** and **"You are lucky to be here."** Believing that he was speaking for Mr. Combs, Ms. Richard grew similarly fearful and distrustful of Mr. Pierre.

42.     Mr. Pierre's responses to Ms. Richard's concerns escalated into threats such as **"Where are you going to go?"** and **"What are you going to do?"** Frequently, Mr. Pierre reiterated Mr. Combs' statements  such as **"It gets dark and lonely"** and **"You could be in a dark and lonely place,"** causing Ms. Richard to fear that Mr. Pierre would harm Ms. Richard if she did not comply with Mr. Combs' orders.

43.     The unrelenting and rigorous schedule of rehearsals, performances, and near-constant filming that Mr. Combs imposed caused Ms. Richard to experience extreme weight loss, dehydration, fatigue, and painful rashes from the microphone pack she was required to wear on her back. These conditions intensified Ms. Richard's feelings of powerlessness, as she increasingly viewed them as part of her professional reality and feared the consequences of any resistance.

44.     In a further assertion of power and dominance, Mr. Combs insisted on holding meetings while dressed only in his underwear. On one occasion in 2008 at his Miami residence, Mr. Combs emailed Ms. Richard directing her to meet him in the living room. When she arrived, he was wearing only his underwear, Ms. Richard asked Mr. Combs to put clothes on, but he angrily refused, stating **"This is my fucking house."** Mr. Combs then conducted a meeting lasting approximately an hour while dressed in his underwear, causing Ms. Richard to feel violated and embarrassed, and amplifying her feelings of powerlessness.

45.     Following the official *Danity Kane* breakup in early 2009 effectuated by Mr. Combs, Ms. Richard experienced significant financial hardship. With no prospective

opportunities for employment within the entertainment field, Ms. Richard spent several months traveling from Baltimore to Daddy's House Recording Studio in New York, without pay or allocated budget.  Mr. Combs promised that Ms. Richard's compositions would result in payment of license fees and royalties pursuant to her contracts with Combs' companies; however, no such compensation was ever reported or paid to Ms. Richard.

### *Diddy – Dirty Money*: Ms. Richard Experiences Mr. Combs' Gender-Based Physical Violence, Criminal Acts, Sexual Assault, Threats, and Intimidation

46.     By approximately the fall of 2009, many of Ms. Richard's compositions had been recorded by other artists associated with Combs.  Due to the success of her compositions, Ms. Richard was invited to meet with musical artist Witness 1, and shortly thereafter Mr. Combs, Ms. Richard, and Witness 1 formed a new group: *Diddy – Dirty Money*.

47.     Throughout the time that Ms. Richard worked for Mr. Combs, she entered into various agreements with Mr. Combs and his companies. Such agreements included a 2009 agreement with Mr. Combs' company, Sean Comb Music, Inc., for the exclusive provision of her services. The agreement states that Ms. Richard's services would be performed subject to the "direction, control, and supervision" of Sean Comb Music, Inc. and/or its designees.

48.     Initial recording for *Diddy – Dirty Money*'s album *Last Train to Paris* took place in Mr. Combs' home on Doheny Drive in Los Angeles, California. On the first day of recording, Ms. Richard and Witness 1 arrived at Mr. Combs' home and waited in the kitchen, where Mr. Combs' girlfriend, Ms. Ventura, was preparing eggs for him.

49.     Ms. Richard observed Mr. Combs come down the stairs looking high on drugs, enter the kitchen, approach Ms. Ventura, and scream, in substance: "I've been asking you for my shit; I can't stand you bitch, you never do it right!" Mr. Combs pushed Ms. Ventura against the wall and choked her, then attempted to strike Ms. Ventura with the pan of eggs, causing her to

fall to the ground in a fetal position. Cursing and screaming, Mr. Combs punched and kicked Ms. Ventura repeatedly and proceeded to drag Ms. Ventura up the stairs.

50.    Frozen in shock and terror, Ms. Richard heard Combs screaming at Ms. Ventura, glass shattering, crashing, and banging noises from the second floor above. Ms. Richard wanted to intervene and help Ms. Ventura, but Witness 1 adamantly refused to interfere in Mr. Combs' relationship, and physically led Ms. Richard out of the residence. Terrified and shaken, Ms. Richard returned to her hotel where she was unable to sleep due to worrying about Ms. Ventura and her own safety.

51.    The following day, Ms. Richard received a call demanding that she return to Mr. Combs' residence to continue recording. Mr. Combs brought Ms. Richard and Witness 1 into his home studio, locked the door, dimmed the lights, and gave each of them flowers.  With the door locked, Mr. Combs went on at length, stating in substance: **"this is normal, this was just a lover's argument where no one was hurt . . . this is what love is… I'm giving you an opportunity, if you want to make it, you'll shut your mouth**…**if you say anything, there will be consequences."**  Mr. Combs further warned that "**people end up missing.**" Being threatened while locked for over 20 minutes in a small, enclosed space with Mr. Combs after observing Mr. Combs violently assault Ms. Ventura the day before, Ms. Richard was terrified and believed that Mr. Combs would follow through on his threats.

52.    In or around November 2009, after the Soul Train Awards in Atlanta, Georgia, Mr. Combs flew Ms. Richard and Witness 1 to his house in New York on his private jet for an afterparty. There were many well-known celebrities at the afterparty, and copious amounts of illegal drugs were being openly consumed. Upon information and belief, Mr. Combs had arranged for dozens of young women and girls – some of whom appeared to be underage – to be transported to the party. The women arrived wearing little to no clothing and were given drugs and alcohol. Many of them appeared lethargic or passed out while Mr. Combs and his guests performed sexual

acts on them. Ms. Richard believed that her presence at the party was a test to see whether Mr. Combs could trust her.

53.    During this afterparty, Mr. Pierre was present in the same room that the above-mentioned incapacitated young women were being subjected to involuntary sexual acts

54.    Mr. Combs repeatedly made statements such as **"this is a buffet," "enjoy yourselves," "this is what we do," and "this is how we party."** Ms. Richard felt shocked and horrified at the sight of Mr. Combs and his guests violating incapacitated young women, and implored Mr. Combs' personal assistant to allow her to leave. Mr. Combs' personal assistant insisted that Ms. Richard wait 15 minutes for her to "make it make sense" – that is, to make Ms. Richard's exit less conspicuous so that Mr. Combs would not notice that she had left. Knowing that she was not free to leave and had to wait for Mr. Combs' personal assistant to help her orchestrate her departure, Ms. Richard experienced feelings of panic and being trapped against her will.

55.    Mr. Combs regularly placed Ms. Richard in similar situations with no means to escape. At Mr. Combs' drug-fueled parties, his guests, including Ms. Richard, were required to surrender their phones upon entry. Mr. Combs kept the doors locked and guarded by security personnel, making it impossible for Ms. Richard to leave without alerting Mr. Combs that she had done so. Mr. Combs hired police officers to attend his parties, sending a clear message to guests that his influence extended to law enforcement officers, and creating a climate of fear and a tacit warning that reporting him to authorities would be both unacceptable and futile.

56.    On many occasions, Mr. Combs had parties at his Miami, Florida residence that lasted for several days. At one of the parties, Ms. Richard witnessed Mr. Combs openly stating that he had arranged for busloads of young "exotic" girls, such as mixed Black and Asian, Indonesian, and albino. Once again, Ms. Richard observed inebriated young girls being sexually

violated by Mr. Combs and his guests. In a state of panic and terror, Ms. Richard fled to the bedroom Mr. Combs had insisted she stay in and barricaded the door shut with furniture.

57.    Mr. Combs openly assaulted Ms. Ventura in front of Ms. Richard and other witnesses on multiple occasions.  Frequently, when Ms. Ventura attempted to voice an opinion or stand up to Mr. Combs, he would strike her or wrap his hands around her throat and choke her.

58.    In 2009, Ms. Richard observed Mr. Combs punch Ms. Ventura in the face at his New York City residence.

59.    In or around 2010, *Diddy – Dirty Money* was in New York preparing to perform at a festival. Inside their vehicle, Mr. Combs grabbed Ms. Ventura's neck, pinned her head against the window glass, and choked her while yelling **"you gonna get fucked up today."** This incident took place in the backstage area just outside the festival and was entirely visible to passersby through the vehicle's sliding door, which was open.

60.    In or around 2010, Mr. Combs hosted a dinner at a West Hollywood, California restaurant, which Ms. Richard and Witness 1 were required to attend. Among the guests at the dinner were celebrities like NeYo and Usher, as well as Mr. Pierre and then-CEO of Interscope Records Jimmy Iovine. At the dinner, Mr. Combs and Ms. Ventura had an argument. In front of the dinner guests, Mr. Combs hissed at Ms. Ventura in a screaming whisper and forcefully punched her in the stomach causing her to double over in visible pain, crying. Mr. Combs' personal assistant escorted Ms. Ventura out of the restaurant, and Mr. Combs remained and continued socializing with the dinner guests. Watching Mr. Combs openly assault Ms. Ventura in front of various celebrities and other powerful music industry representatives amplified Ms. Richard's fears that Mr. Combs could one day harm her and that his actions would be accepted and normalized by everyone surrounding him.

61.    After the West Hollywood dinner, Ms. Richard was in a vehicle with Mr. Combs, Ms. Ventura, Witness 1, and one of Mr. Combs' bodyguards. In the vehicle, Ms. Ventura told Mr.

Combs that he should not have abused her in public and that she felt embarrassed. Mr. Combs grabbed Ms. Ventura's neck and struck her in the mouth. No one acknowledged Mr. Combs' abuse, and all of the vehicle's occupants remained quiet for the rest of the ride.

62.     On the first several occasions that they observed Mr. Combs assault Ms. Ventura, Ms. Richard and Witness 1 spoke with Ms. Ventura to support and encourage Ms. Ventura in escaping her abusive relationship with Mr. Combs. Every time that Ms. Richard and Witness 1 tried to intervene, Mr. Combs learned of the conversation and became irate. On many such occasions, Mr. Combs screamed at the women in substance: **"Y'all bitches don't get in my relationship," "Don't tell my bitch [Ms. Ventura] what she need to be doing," "Just make money and shut the fuck up," "I end artists," "I shelve careers," "You could be missing,"** and **"You bitches want to die today,"** among other threats.

### _Diddy – Dirty Money_: Mr. Combs Subjects Ms. Richard to Labor Trafficking and Oppressive and Hostile Working Conditions

63.     In or around the fall of 2009, _Diddy – Dirty Money_ began recording the song _Love Comes Down_. Upon information and belief, Mr. Combs continued to use drugs that caused him to remain awake for prolonged periods of time. When he was awake, he would demand that Ms. Richard and Witness 1 record in the studio, where they would be forced to spend three to four consecutive days recording without a break to eat or sleep. Mr. Combs required Ms. Richard and Witness 1 to remain at his home(s) continuously, denying them the opportunity to return to their hotel rooms for breaks. The degree of control Mr. Combs exercised over Ms. Richard's daily life and basic needs exacerbated the significant power imbalance and threatening atmosphere that ensured Ms. Richard's compliance with his demands.

64.     Mr. Combs often left the studio and required Ms. Richard and Witness 1 to stay and write verses to songs. Occasionally, Ms. Richard tried to leave to get something to eat or to go to her hotel. Whenever Ms. Richard tried to leave, Mr. Combs would call and demand in

substance **"where the fuck are you?"** and **"we have an album to make."** Mr. Combs frequently made threats, especially if they asked for food or rest, stating in substance **"you're a bitch," "I don't want to see your fucking face," "I make n****s go missing,"** and **"I make things go away."** Each time, Ms. Richard returned to the studio immediately, fearing that Mr. Combs was capable of following through with his threats.

65.     Mr. Combs criticized Ms. Richard for being "too skinny," yet denied her requests for food and demanded that she consume peanut butter shakes. Mr. Combs had full meals prepared by a chef and ate them in front of Ms. Richard and Witness 1, never offering them food.

66.     Ms. Richard and Witness 1 begged for food and rest breaks, but Mr. Combs refused, making statements such as **"absolutely fucking not"** and **"this is what it takes to be great."** Mr. Combs' responses underscored the threat he posed and heightened Ms. Richard's concerns for her safety and well-being.

67.     As Ms. Richard continued to work non-stop – transitioning between the studio, rehearsals, workouts, and back to the studio – she became severely dehydrated and experienced chronic stomach cramping from being undernourished and excessively thin. On the numerous occasions that she told Mr. Combs that she was not feeling well, he called her lazy and dismissed her health concerns, instilling in her further apprehension of communicating her needs.

68.     In or around the summer of 2010, Ms. Richard experienced abdominal pain, swollen glands and a fever. She was hospitalized and diagnosed with arthralgia (joint pain due to overuse, sprains, tendonitis and infection), anemia, and a low white blood cell count. Ms. Richard presented Mr. Combs with her medical records specifying that she needed to emphasize eating well, being adequately hydrated, and getting adequate rest, but Mr. Combs ordered her to report to the studio the next day for another multi-day recording session. Mr. Combs' blatant disregard for her health and well-being cemented Ms. Richard's fear of his authority and control over her career and health.

69.    Ms. Richard continued to witness Mr. Combs' abuse towards Ms. Ventura, who often wore sunglasses and makeup in an attempt to hide visible injuries. These incidents further solidified Ms. Richard's fear of Mr. Combs, as they were constant reminders of the physical dangers she potentially could – and eventually would – face.

70.    Mr. Combs often exhibited uncontrollable anger during recording sessions, throwing objects like albums, laptops, and food against the wall or at individuals. Mr. Combs frequently flew into frenzied, unpredictable rages. On the rare occasion that any of Mr. Combs' employees stood up to him and refused his demands, it was typical for him to fire them in a fit of rage. Both Mr. Pierre and Mr. Combs made it clear that there would be severe "repercussions" if Ms. Richard or any other employees failed to comply with Mr. Combs' orders.

71.    Throughout Ms. Richard's tenure with *Diddy – Dirty Money*, Mr. Combs and his bodyguards frequently carried firearms. On a near-constant basis, Ms. Richard observed a firearm either on Mr. Combs' person or in close proximity to him, including when he was in the recording studio. The knowledge that Mr. Combs was armed with a deadly weapon made his volatile, erratic, and drug-fueled behavior even more frightening and further amplified Ms. Richard's fear of making any misstep that could direct his anger toward her.

72.    Because Ms. Richard had witnessed Mr. Combs' violent nature, a side of Mr. Combs that the world had not yet seen, she feared that falling out of Mr. Combs' good graces or worse, standing up to him or speaking out against him, could result in serious harm to her. Ms. Richard frequently thought about Mr. Combs' threat about making people "go missing" and feared taking any action that could label her as a target.

73.    Mr. Combs' death threats, coupled with the near-constant visible display of firearms and his violent outbursts and brutal assaults on Ms. Ventura, created an atmosphere of fear and intimidation that coerced Ms. Richard into continuing to work under these inhumane conditions.

74.     Despite Mr. Combs' violence, threats, and misogyny, *Diddy – Dirty Money* experienced significant sales of records, selling 2,000,000 copies of one single, 500,000 of another in the US, and 5,000,000 single copies in Australia. Ms. Richard's unpaid wages and royalties are estimated at $1,200,000.00. Ms. Richard's unpaid touring wages are estimated at over $350,000.00 for touring dates within the United States alone.

75.     Mr. Combs routinely forced Ms. Richard to provide her performance services at events, overnight parties, and promotional appearances to endorse brands with which he had secured lucrative agreements including Ciroc, DiddyBeats, Flip Camera, the National Football League ("NFL"), and the Major League Baseball ("MLB") World Series—reaping substantial financial gains for himself and his companies, all without Ms. Richard's knowledge that she would not be appropriately compensated. He simply ordered her to appear and perform with *Diddy-Dirty Money*, often with little to no notice and without any discussion of payment. Ms. Richard was not free to decline, as Mr. Combs' demands were always accompanied by implicit or explicit threats. On many occasions, she was required to attend an event at a moment's notice, unaware that her performances were being leveraged for brand promotion.

**Mr. Combs Sexually Harasses and Assaults Ms. Richard**

76.     Between approximately 2009 and 2011, throughout *Diddy – Dirty Money*'s recording process, rehearsals, and performances, Mr. Combs repeatedly ordered Ms. Richard to strip down to her underwear. He frequently referred to her and Witness 1 as **"bitch"** or "**whore**" and made demeaning remarks about their bodies, alternatingly calling them **"lazy," "fat," "ugly,"** and **"skinny,"** particularly in front of his friends and employees.

77.     Mr. Combs frequently held meetings with Ms. Richard wearing only his underwear, despite Ms. Richard's protests and repeated requests for him to put on clothing. In

response, Mr. Combs called her a **"bitch"** and **"whore"** and reminded her that she should be **"grateful for the opportunity to be there."**

78.     Often while they were recording, Mr. Combs would hold "parties" in his studios. When such "parties" occurred in the Daddy's House studio, Mr. Pierre was typically present. For such parties, Mr. Combs invited young men and women, who were often scantily dressed and appeared underage, to use drugs and engage in sex acts. Ms. Richard observed Mr. Combs and his colleagues kissing, groping, and inappropriately touching the young women. Upon information and belief, the participants often left the immediate area to have sex and returned shortly thereafter.

79.     On numerous occasions between approximately 2009 and 2011, under the guise of preparing for the *Last Train to Paris* tour, Mr. Combs intruded into Ms. Richard's changing room at *Daddy's House* unannounced while Ms. Richard was undressed and made sexual advances toward her.

80.     Even though a female stylist was present and assisting Ms. Richard with her wardrobe for the *Last Train to Paris* tour performances, Mr. Combs entered the changing room and groped Ms. Richard's body, including her bare buttocks and her chest area near her breasts. With no legitimate purpose, and without Ms. Richard's consent, Mr. Combs coercively gripped Ms. Richard's buttocks to show the stylist where he wanted her high-waisted panties positioned, and grazed her breasts, under pretense of showing the stylist where he wanted her bra straps to go.

81.     While forcibly groping her body, Mr. Combs coerced Ms. Richard with fraudulent promises that he would ensure her professional success if she complied. By actively recruiting her into performances and enticing her with career advancement, Mr. Combs leveraged his power and influence to exert control over her. He repeatedly conditioned her success on compliance with his directives, stating in substance, **"If you wear what I tell you and let me do what I do, you**

**will go to the top."** As he touched Ms. Richard's body without her consent, Mr. Combs made statements such as **"Let me form you," "Let me build you,"** and **"Let me shape you,"** and stated while looking at her approvingly, **"Yeah, Babygirl."**

82.     On the occasions that Mr. Combs entered the changing room, Ms. Richard covered her chest with her hands to prevent Mr. Combs from seeing or touching her breasts. When Mr. Combs forcibly touched her body, Ms. Richard attempted to swat his hands away and made protests such as "don't touch me." Mr. Combs frequently smacked Ms. Richard's bare buttocks and often commented on her body, noting that although she was **"too skinny,"** she had an **"ass."** When Ms. Richard asked him to stop or to leave the room, Mr. Combs reiterated his coercive statements and fraudulent promises such as, in substance, **"I'm trying to help you,"** and **"If you let me shape you, you will go to the top."**

83.     Ignoring her visible and communicated discomfort, Mr. Combs persisted and continued to intrude when Ms. Richard was in the dressing room, continued to touch her buttocks and breast area under the guise of showing the stylist what to do, and continued to smack her buttocks without her consent.

84.     In or around October 2010, as part of the promotional *Last Train to Paris* tour, *Diddy – Dirty Money* performed in Glasgow, Scotland, where Mr. Combs engaged in overt sexual advances towards Ms. Richard. On numerous occasions when Ms. Richard exited the dressing room fully styled, Mr. Combs looked at her approvingly and smacked her buttocks while making comments such as **"you're looking good," "OK Dawn, OK,"** and **"I see what that is"** in a flirtatious tone. Each time, Ms. Richard moved away and asked him not to touch her, but Mr. Combs disregarded her protests.

85.     On their last night in Glasgow, Ms. Richard witnessed Mr. Combs and several other males gang-banging another one of Mr. Combs' female assistants at the hotel pool. Ms. Richard immediately left and went to her hotel room.

86.     On their flight back to the United States the next day, Ms. Richard asked Mr. Combs where the assistant was; Mr. Combs replied, **"I don't give a fuck where that bitch is."** Ms. Richard later learned that Mr. Combs had taken the assistant's passport with him to the United States, leaving the assistant stranded in the United Kingdom.

87.     In Glasgow, Witness 1 confided in Ms. Richard that her husband and manager was abusive. After an especially severe assault, she confided in Ms. Richard that she wanted to leave her husband, and Ms. Richard helped her to plan her exit from the relationship. However, Witness 1 and her husband reconciled, and both Mr. Combs and Witness 1's husband – who had a close relationship – learned of Ms. Richard's role in helping Witness 1.  Both Mr. Combs and Witness 1's husband became noticeably distrustful of Ms. Richard, which exacerbated her fears of harm and reprisal.

88.     When Mr. Combs would require his *Diddy – Dirty Money* bandmates to stay at his residence in Miami, Ms. Richard barricaded herself inside her room at night, placing heavy furniture against the door because she feared being harmed in her sleep.

89.     In or around late December 2010, Ms. Richard, Witness 1, and Ms. Ventura were in Mr. Combs' Los Angeles home when Mr. Combs stated **"I want to gift you** [fake] **titties for Christmas."** Mr. Combs reached out and cupped Ms. Richard's breasts without her permission and stated **"You're an A; I'm thinking a D**." Ms. Richard recoiled in shock and left the room.

90.     Throughout the abovementioned time period, when Ms. Richard resisted Mr. Combs' advances, he retaliated against her by undermining her career, interfering with her ability to perform, and depriving her of professional opportunities—including denying her vocal parts, removing her from songs, barring her from performing, and even cutting off her microphone during live performances. The more Ms. Richard rebuffed his advances, the more Mr. Combs' retaliatory behavior increased, including withholding funding, earned wages, per diem and promotions pay, and instructing the companies in charge of such payments to do the same.

**Mr. Combs and Mr. Pierre Assault and Falsely Imprison Ms. Richard**

91.    In or around December 2010, Diddy – Dirty Money was preparing for an upcoming performance on *Saturday Night Live* ("SNL"). As usual, rehearsals lasted for days without the opportunity to eat or rest, and the rehearsal schedule was unpredictable.  After waiting all day for Mr. Combs to call or send a car, Ms. Richard received a phone call from Mr. Combs making demands such as, **"Where the fuck are you bitches?"  "You bitches don't want this,""y'all don't deserve to have someone pick you up," "get a cab."** Ms. Richard and Witness 1 immediately took a taxi to SIR Studios at 520 West 25th St, New York NY, anxious because Mr. Combs sounded enraged.

92.    Upon their arrival at SIR Studios, Mr. Combs, his bodyguard, and Mr. Pierre were waiting for them in the lobby. Mr. Combs screamed obscenities at them, including: **"Where the fuck were you bitches?" "You bitches don't want to win," "you don't want this," "I'm so tired of y'all**." Ms. Richard noticed that people in the lobby were reacting to Mr. Combs' tirade. Embarrassed, Ms. Richard asked Mr. Combs to stop swearing and calling them "bitches" in front of everyone.

93.    Mr. Combs' facial expression shifted as he stepped towards Ms. Richard, raised his arm, and swung his fist toward her face. Mr. Pierre and Mr. Combs' bodyguard, who were standing next to Mr. Combs, began shouting at Ms. Richard. Mr. Pierre raised his hand and swung it towards Ms. Richard's face. Believing that Mr. Combs and/or Mr. Pierre were going to hit her, Ms. Richard braced for the impact. Before she was struck, Mr. Combs' bodyguard grabbed her, escorted her out of the studio and forced her into a Bentley that was parked outside. Witness 1 ran after Ms. Richard, and Mr. Combs' bodyguard closed and locked the Bentley's doors with both women inside.

94.    Inside the vehicle, Ms. Richard realized there were no interior door handles, and that they were locked inside with no way to escape. Ms. Richard's belongings were in the studio,

but she was able to call her father from Witness 1's cell phone. Ms. Richard relayed to her father what had happened, and that she needed help and feared that she would go missing. Moments later, Mr. Combs' bodyguard removed only Witness 1 from the Bentley, leaving Ms. Richard locked in the car alone.

95.     Ms. Richard screamed as loudly as she could, but no one responded.  It was late evening in the wintertime, the windows were heavily tinted, and the interior of the car was dark except for faint interior lights. Ms. Richard's belongings and winter coat were in the studio, while the ignition was off and there was no heat. With Mr. Combs' prior threats and violence running through her mind, Ms. Richard felt sheer panic, terror, and feelings of claustrophobia at being locked in a small, dark, enclosed space with no way to communicate or call for help. She began to feel cold and feared for her life, not knowing when or if she would be released.

96.     Ms. Richard's father drove to New York from Baltimore and arrived at the studio within a few hours. Mr. Pierre ushered Ms. Richard's father between several rooms at SIR Studios, where he waited until he was able to confront Mr. Combs. Only after Ms. Richard's father demanded to see her did Mr. Pierre order Mr. Combs' bodyguard to release Ms. Richard from the vehicle.

97.     After Ms. Richard was released from the vehicle, Mr. Pierre did not bring her directly to see her father. Mr. Pierre led her into a small room at SIR Studios and locked her inside. Ms. Richard yelled and pounded on the door, but no one responded. Eventually, Mr. Pierre returned and brought Ms. Richard to see her father.

98.      Mr. Combs and Mr. Pierre both warned Ms. Richard's father to **"think about your family"** and **"think about your daughter's career."** Her father appeared visibly frightened by Mr. Combs' and Mr. Pierre's threats and actions, which in turn made Ms. Richard feel terrified for herself and her family's safety.

99.    The next night, *Diddy – Dirty Money* performed on SNL. Mr. Combs subsequently called Ms. Richard, complimented her performance, and concluded with a clear threat, which included: **"you don't call your Dad unless you're in the hospital."**

**Mr. Combs and Love Records Infringe Ms. Richard's Copyrights**

100.    In August 2023, Mr. Combs' record company, Love Records Inc., of which Mr. Combs was/is President, tendered a contract for negotiation to Ms. Richard for the song entitled *Deliver Me*, embodied as Track 3 on Mr. Combs' album *The Love Album: Off The Grid.*

101.    In late August 2023, Mr. Combs personally called Ms. Richard and left a voicemail complaining about her fair requests, including the artist fee Ms. Richard required.

102.    Continuing to the present, Ms. Richard sought and seeks to establish her rightful percentage as a 21% composer/featured artist on *Deliver Me*. Upon information and belief, Mr. Combs directed his attorneys to avoid confirming the composition percentages on the song; and in fact and instead, listed and credited composers who played no part in composing the song.

103.    As a result, the *Deliver Me* contract was never agreed to nor signed by either Ms. Richard or Love Records Inc.

104.    On September 14, 2023, and continuing to date, Defendants Love Records Inc. and Mr. Combs infringed Ms. Richard's copyrights in the composition of *Deliver Me* by pre-releasing and then officially releasing *Deliver Me* on September 15, 2023 without Ms. Richard's permission, agreement or compensation thereon.

105.    Ms. Richard obtained a copyright registration certificate on a timely basis; said registration lists authors/claimants as agreed when the song was created in 2009. That registration is filed separately in the Court and supports Ms. Richard's claim of copyright infringement by Defendants herein.

106.    Upon information and belief, *Deliver Me* sold well prior to the filing of Ms. Ventura's federal lawsuit against Mr. Combs in November 2023.

107.    Ms. Richard has never received an accounting, nor information relative to the publishing of her composition in *Deliver Me*, nor royalties thereon from named Defendants or their attorneys or agents.

## Ms. Richard's Copyrights in *Deliver Me*

108.    Ms. Richard wrote lyrics and performed vocals on the collaborative song *Deliver Me*, along with Busta Rhymes, Witness 1 and Mr. Combs in 2009.  Significantly, Ms. Richard wrote the first verse and an interlude, but also the chorus/vocal hook[4]  of *Deliver Me* as follows:

> Wanna get lost in you baby
> I see the spark in your eyes tonight
> I'm caught up in your vision
> If I can just stop time
> I been holding on for so long
> Too scared to let go
>
> *Chorus/Hook:*
>
> *'Cause I (I) want you (want you), need you (need you)*
> *To **Deliver Me** (will you close your eyes? Will you close your eyes?)*
> *From the darkness (don't go)*
> *No need to go (do you see what I see?)*
> *I (I) want you (want you) to bring me through (talk to me, talk to me)*
> *Right now (right now)*
> *I want you to (I want you to, close your eyes)*
> *Right now (I)*
> *I need you to (want you)*
> *I need you to*

109.    In 2009, when *Deliver Me* was created, to the best of Ms. Richard's recollection, the parties utilized a James Dewitt Yancy aka J Dilla underlying track and agreed that the composition/publishing splits would be 21% for each vocalist [totaling 84%] with the balance of 16% reserved for J Dilla's estate.

110.    Ms. Richard is the author of her performed composition and sound recording of *Deliver Me*, which Ms. Richard duly registered on November 6, 2023 with the United States

---

[4]  The "hook" is a term used in popular music for the signature melodic material of the work by which the work is recognized. A "vocal hook" is usually the phrase in which the title lyrics are sung.

Copyright Office under US Copyright Reg. No. PA-441-387.  Said registration lists authors as stated above and is attached as Exhibit A and incorporated herein by this reference.

111.    Ms. Richard owns copyrights in the musical composition, rights of performance therein, and the exclusive rights to reproduce and distribute to the public by sale or other transfer of ownership, or by lease, lending or license, reproductions of the copyrighted works under Copyright Act, 17 U.S.C.§ 106.

112.    No written agreement was ever signed, nor was a release ever given by Ms. Richard regarding Ms. Richard's composition, sound recording or performance on *Deliver Me*.

**Mr. Combs and Love Records' Unauthorized Publication of *Deliver Me***

113.     *Deliver Me* was created in 2009. On information and belief, the song *Deliver Me* remained unpublished in Combs and his companies' possession until 2022-2023, when it was chosen by Combs to be included on *The Love Album: Off the Grid*.

114.    On August 11, 2023, Ms. Richard received a contract originating from Defendant Love Records Inc., and Tri Star Sports & Entertainment Group ("Tri Star") relative to the inclusion of *Deliver Me* on *The Love Album: Off The Grid* [hereafter the "*Deliver Me* Contract"].

115.    The *Deliver Me* Contract was last edited on May 17, 2024 as version 13, but was never completed nor signed. The composition percentages remained a sticking point for Defendants Love Records Inc. and Tri Star.

116.    Mr. Combs contacted Ms. Richard directly, leaving a long voice message in an intimidating tone relative to the low budget for *Deliver Me* on *The Love Album: Off the Grid*, and protesting that payment for Ms. Richard's contribution should be an advance versus a flat fee.

117.    Upon his direction, Mr. Combs' legal team consistently attempted to have Mr. Combs' management interfere with the attorney-attorney negotiation and circumvent it by contacting Ms. Richard directly.  Mr. Combs' legal and management team were relentless in their

attempts for Ms. Richard's compliance on the *Deliver Me* Contract since they presented contradicting percentages every time Ms. Richard insisted on the agreed-upon 21%.

118.    On the dates Defendants caused the first publication of *Deliver Me* on September 14, 2023 via Vimeo and YouTube, and the official release on September 15, 2023, the *Deliver Me* Contract was not agreed to by Ms. Richard and Defendants Love Records, or Mr. Combs except for the term of $25,000 as a flat featured artist fee for Ms. Richard. The *Deliver Me* Contract was not signed by any party and Defendants were wholly aware of this fact.

119.    On September 15, 2023, Tri Star initiated a $25,000 wire transfer to Ms. Richard via her counsel; whereupon, Ms. Richard informed all parties that, the $25,000 would remain in a client trust account and not be disbursed to Ms. Richard unless and until the *Deliver Me* Contract was agreed and fully executed. Ms. Richard also informed Defendants that their publication absent the *Deliver Me* Contract's completion is copyright infringement.

120.    *The Love Album: Off the Grid* contains *Deliver Me* as its third song, and was released in several formats, including physical copies, digital sales, streaming and downloads. *The Love Album: Off the Grid (Extended)* version was released on September 20, 2023 and *The Love Album: Off the Grid – Standard Double Red Vinyl* is also available for purchase. All versions of *The Love Album: Off the Grid* were and continue to be available, and have garnered millions of unit sales and hundreds of millions of views on Spotify, YouTube, Apple Music, Amazon and other myriads of streaming services.

121.    *The Love Album: Off The Grid* garnered a Top 10 (Number 5) on the R&B/Hip-Hop charts, Number 19 on the Billboard 200, and in its first week, sold 30,000 album units. Defendant COMBS received his first Grammy nomination as a lead artist for *The Love Album: Off the Grid* in Best Progressive R&B Album category at the 66th Grammy Awards.

122.    On information and belief, Defendants Mr. Combs and Love Records all had access to Ms. Richard's original elements, musical composition, sound recording and

performance in *Deliver Me*, and thereupon utilized same without a license, authorization or consent from Ms. Richard.

**Mr. Combs Engages in Witness Tampering**

123.    Plaintiff filed her original complaint on September 10, 2024. Just three days later, on September 13, 2024, Witness 1 publicly denied Plaintiff's claims in a statement on Instagram. Shortly thereafter, on September 17, 2024, prosecutors in Mr. Combs' criminal case submitted a letter to the court (Case No. 1:24-cr-00542, Doc. 5), opposing bail and citing Mr. Combs' history of witness tampering and obstruction of justice. The letter states:

> *"Most glaringly, the defendant also poses a significant risk of obstructing justice. Indeed, and as set forth below, during the course of the charged conduct, the defendant has attempted to bribe security staff and threatened and interfered with witnesses to his criminal conduct. He has already tried to obstruct the Government's investigation of this case, repeatedly contacting victims and witnesses and feeding them false narratives of events."*

124.    At Mr. Combs' bail hearing on September 17, 2024, the prosecution further revealed that between September 10, 2024 (the date of Plaintiff's complaint) and September 14, 2024 (the day after Witness 1's public statement), Mr. Combs and Witness 1 had 128 phone contacts. In just four days, Mr. Combs called or texted Witness 1 fifty-eight times, after which all communication ceased. (See Case No. 1:24-cr-00542, Criminal Hearing Transcript dated 09/17/2024).

## DAMAGES

125.    As a result of the acts and conduct complained of herein, Ms. Richard has suffered and will continue to suffer the loss of income, wages, benefits, royalties, promotional fees, touring fees and other compensation. Ms. Richard has also suffered, among other things, future pecuniary

losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, post-traumatic stress disorder, anxiety disorder, insomnia, panic attacks and other non-pecuniary losses entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorney's fees and costs, and other remedies as this Court may deem appropriate.

126.    Ms. Richard did not process the impact of her experiences until she read Ms. Ventura's civil complaint in November 2023. Ms. Ventura's complaint detailed specific facts that triggered painful and uncomfortable memories that Ms. Richard had previously compartmentalized and avoided reliving. Re-experiencing these memories years later enabled Ms. Richard to recognize that her sufferings—including her struggles with intimacy, self-confidence, body image, and debilitating insomnia—were connected to the sexual assaults she endured at the hands of Mr. Combs. Immediately following the assaults, she pushed them out of her mind and was unaware of how his actions had affected her. It was not until she processed those experiences after having lived through their yearslong effects that she understood that her personal struggles were a direct result of those experiences.

## FIRST CAUSE OF ACTION
### Violation of The Victims of Gender-Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq*. ("VGMVPL")
#### *Against Sean Combs and Harve Pierre*

127.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

128.    The above-described conduct, including but not limited to Mr. Combs' physical and sexual assaults, harassment, and unlawful imprisonment of Plaintiff in New York City, and Mr. Pierre's assault and unlawful imprisonment of Plaintiff constitute a "crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined in § 10-1103 of the New York City VGMVPL.

129.    The term "crime of violence" means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution or conviction; and the term "crime of violence motivated by gender" means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.

130.    The above-described unlawful acts of Mr. Combs against Plaintiff, including, but not limited to, sexual assault, physical assault, threats, and false imprisonment, are proscribed by PL 110/120.00(1), PL 120.15, PL 240.30(3), PL 135.05; PL 135.10 Pl 130.52, PL 240.30(1)(a), PL 120.14(2), PL S 135.5(3), constitute "crimes of violence" against Plaintiff and constitute "crimes of violence motivated by gender" as defined in § 10-1103.

131.    The above-described unlawful acts of Mr. Pierre against Plaintiff, including, but not limited to, physical assault, threats, and false imprisonment, are proscribed by PL 110/120.00(1), PL 120.15, PL 240.30(3), PL 135.05; PL 135.10, PL 240.30(1)(a), PL 120.14(2), PL S 135.5(3), constitute "crimes of violence" against Plaintiff and constitute "crimes of violence motivated by gender" as defined in § 10-1103.

132.    As a direct and proximate result of the above mentioned crimes of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys' fees and costs, and other remedies as this Court may deem appropriate, as set forth in § 10-1104.

133.    Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

## SECOND CAUSE OF ACTION

**Sexual Assault pursuant to The California Sexual Abuse and**
**Cover Up Accountability Act, Cal. Civ. Proc. § 340.16**
*Against Sean Combs*

134.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

135.    Mr. Combs subjected Plaintiff to sexual battery, as defined in Cal. Penal Code §§ 234.4(e)(1). In doing so, he intended to and did cause harmful and sexually offensive contact with their person and place them in imminent apprehension of such contact.

136.    Pursuant to California Code of Civil Procedure § 340.16, as amended by Assembly Bill 2777, this cause of action is timely because it is commenced within three years of November 2023, when Plaintiff discovered the injuries resulting from these Defendants' acts, which Plaintiff had not previously discovered, and could not have reasonably discovered, due to the commission of Mr. Combs' crimes that imposed severe duress and other psychological trauma upon her.

137.    As a direct and proximate result of Mr. Combs' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

138.    Plaintiff also seeks reasonable attorneys' fees as provided under Cal. Civil Code § 52.5.

**THIRD CAUSE OF ACTION**
**Forced Labor in Violation of 18 U.S.C. §§ 1589 and 1595**
*Against Sean Combs*

139.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

140.    Mr. Combs knowingly obtained labor from Plaintiff through threats of serious harm, physical restraint, and other means of coercion, in violation of 18 U.S.C. § 1589.

141.    Under 18 U.S.C. § 1595, Plaintiff is entitled to bring a civil action against Mr. Combs for their violation of 18 U.S.C. § 1589.

142.    As a direct and proximate result of Mr. Combs' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

143.    Plaintiff seeks compensatory damages for the harm suffered as a result of Mr. Combs' forced labor practices.

144.    Plaintiff also seeks punitive damages to deter such conduct by Mr. Combs in the future, along with reasonable attorney's fees and costs.

145.    Mr. Combs' ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the same. Accordingly, Mr. Combs isestopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

### FOURTH CAUSE OF ACTION
### Sex Trafficking under 18 U.S.C. § 1591, *et seq.*
### *Against Sean Combs*

146.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

147.    Mr. Combs, one of the most prominent musical artists and producers in the industry, recruited and enticed Plaintiff by initiating a professional relationship with her and inviting her to join his band *Diddy- Dirty Money* as a singer, songwriter, and performer. This opportunity instilled in Plaintiff the hope and expectation of advancing her career and achieving greater success in the music industry.

148.    Mr. Combs, through a pattern of coercive threats and displays of brutal violence, caused, coerced and/or enticed Plaintiff to engage in and/or submit to commercial sex acts, as defined by 18 U.S.C. § 1591(e)(3). These acts were carried out to further Mr. Combs' financial

gain from Ms. Richard's participation in *Diddy – Dirty Money*, to exert control over her, and to satisfy his own sexual gratification.

149.    Mr. Combs used fraud and force to coerce and entice Ms. Richard into commercial sex acts. Mr. Combs did so by making threats of career derailment and promises of career advancement in exchange for Ms. Richard acquiescence to and submission to Mr. Combs' sexual batteries and assaults.

150.    Mr. Combs acted with knowledge or in reckless disregard of the fact that Plaintiff was forced to engage in these acts through coercion and duress and that these acts were in exchange for Combs' support of her professional endeavors, her continued place in the band, and her financial stability.

151.    As a direct and proximate result of Mr. Combs' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

152.    Mr. Combs' ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the same. Accordingly, Mr. Combs is estopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

### FIFTH CAUSE OF ACTION
### Violation of the California Trafficking Victims Protection Act,
### Cal. Civil Code § 52.5
### *Against Sean Combs*

153.    Plaintiff repeats and realleges each and every allegation contained in all of the preceding paragraphs as if fully set forth herein.

154.    Plaintiff is a victim of trafficking within the meaning of Cal. Penal Code § 236.1 and is therefore entitled to bring a civil action under Cal. Civil Code § 52.5.

155.    Mr. Combs' acts and omissions, taken separately and/or together, as outlined above, constitute a violation of Cal. Civ. Code § 52.5. Specifically, Mr. Combs perpetrated human trafficking of Ms. Richard by depriving or violating her personal liberty with the intent to obtain forced labor.At all relevant times, Mr. Combs participated in and facilitated the obtainment of Plaintiff's labor induced by force, fraud, or coercion.

156.    As a direct and proximate result of Mr. Combs' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

157.    Pursuant to Cal. Civ. Code § 52.5(d)(3), Mr. Combs' continuous death threats and coercion induced Plaintiff to delay the filing of this action and asserting her rights within the statutorily proscribed period.  Mr. Combs is estopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff.

158.    Pursuant to Cal. Civ. Code § 52.5(d)(4), the suspension of the statute of limitations due to estoppel applies to all other related claims arising out of the trafficking situation, i.e. all of Plaintiff's claims.

159.    Pursuant to Cal. Civ. Code § 52.5(e), the running of the statute of limitations may be suspended as Plaintiff could not have reasonably discovered her injuries due to the commission of Mr. Combs' crimes that imposed severe duress and other psychological trauma upon her.

### SIXTH CAUSE OF ACTION
### Assault Under New York Law
### *Against Sean Combs and Harve Pierre*

160.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

161.    In engaging in the conduct described above, Mr. Combs committed an assault against Plaintiff because he intentionally placed Plaintiff in reasonable apprehension of imminent harmful or offensive contact, and Plaintiff reasonably feared immediate bodily harm as a result of Mr. Combs' conduct. Mr. Combs' actions amount to violations under N.Y. Penal Law §§ 110/120.00(1), 120.15, as well as analogous California law and the common law of New York and California.

162.    In engaging in the conduct described above, Mr. Pierre committed an assault against Plaintiff because he intentionally placed Plaintiff in reasonable apprehension of imminent harmful or offensive contact, and Plaintiff reasonably feared immediate bodily harm as a result of Mr. Pierre's conduct. Mr. Pierre's actions amount to violations under N.Y. Penal Law §§ 110/120.00(1), 120.15, as well as analogous California law and the common law of New York and California.

163.    As a direct and proximate result of Mr. Combs' and Mr. Pierre's actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

164.    The conduct of Mr. Combs and Mr. Pierre described above was willful, wanton, and malicious. At all relevant times, Mr. Combs and Mr. Pierre acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury, and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from Mr. Combs and Mr. Pierre according to proof at trial.

165.    Mr. Combs' and Mr. Pierre's ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and

enabling her to do the same. Accordingly, Mr. Combs and Mr. Pierre are estopped from asserting the defense of the statute of limitations due to the duress they exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

**SEVENTH CAUSE OF ACTION**
**Battery/Sexual Battery Under New York Law**
***Against Sean Combs***

166.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

167.    In engaging in the conduct described above, Mr. Combs committed a battery against Plaintiff because he intentionally engaged in unlawful, intentional, and offensive touching or application of force to Plaintiff's person. Mr. Combs repeatedly and without consent touched Ms. Richard's body including her buttocks and breast area. Mr. Combs' actions amount to violations under N.Y. Penal Law §§ 150.50, 130.52, 130.55, and 130.65, as well as analogous California law and the common law of New York and California.

168.    As a direct and proximate result of Mr. Combs' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

169.    The above-described conduct by Mr. Combs was willful, wanton, and malicious. At all relevant times, Mr. Combs acted with conscious disregard of Ms. Richard's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Ms. Richard, and intended to cause fear, physical injury, and/or pain and suffering to Ms. Richard. By virtue of the foregoing, Ms. Richard is entitled to recover punitive and exemplary damages from Mr. Combs according to proof at trial.

170.    Mr. Combs' ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the

same. Accordingly, Mr. Combs is estopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

**EIGHTH CAUSE OF ACTION**
**False Imprisonment under New York Law**
***Against Sean Combs and Harve Pierre***

171.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

172.    Mr. Combs falsely imprisoned Plaintiff in New York as alleged in this Complaint, by suddenly and without provocation, willfully and maliciously falsely imprisoning Ms. Richard against her will in a vehicle for approximately two hours.

173.    Mr. Pierre falsely imprisoned Plaintiff in New York as alleged in this Complaint, by suddenly and without provocation, willfully and maliciously falsely imprisoning Ms. Richard against her will in a vehicle and in SIR Studios.

174.    Following Plaintiff's false imprisonment in the vehicle and in SIR Studios, Mr. Combs issued a clear retaliatory threat of future injury and bodily harm to Plaintiff, underscoring the intent to both control and to silence Plaintiff as to Mr. Combs' crimes.

175.    As a direct and proximate result of Mr. Combs' and Mr. Pierre's actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

176.    Mr. Combs' and Mr. Pierre's ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the same. Accordingly, Mr. Combs and Mr. Pierre are estopped from asserting the defense of the statute of limitations due to the duress they exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

## NINTH CAUSE OF ACTION
### False Imprisonment under California Law
### *Against Sean Combs*

177.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

178.    Mr. Combs falsely imprisoned Ms. Richard in California as alleged in this Complaint, by demanding, under false pretenses, that Ms. Richard appear for work, and subsequently, willfully and maliciously threatening and falsely imprisoning Ms. Richard against her will in Mr. Combs' home recording studio.

179.    Following Plaintiff's false imprisonment in Mr. Combs' home studio, Mr. Combs issued a clear retaliatory threat of future injury and bodily harm to Plaintiff, underscoring the intent to both control and to silence Plaintiff as to Combs' crimes.

180.    As a direct and proximate result of Mr. Combs' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

181.    Mr. Combs' ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the same. Accordingly, Mr. Combs is estopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

## TENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### *Against Sean Combs and Harve Pierre*

182.    Plaintiff repeats and re-alleges each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

183.    Mr. Combs' conduct, which included abuse, death threats, sexual assault, false imprisonment, deprivation of basic necessities in the workplace, nonpayment or underpayments, and labor violations was extreme and outrageous, going beyond all possible bounds of decency and utterly intolerable in a civilized community.

184.    Mr. Pierre's conduct, which included threats, assault, false imprisonment, and deprivation of basic necessities in the workplace was extreme and outrageous, going beyond all possible bounds of decency and utterly intolerable in a civilized community.

185.    Mr. Combs' and Mr. Pierre's  conduct was intentional and reckless and Mr. Combs' and Mr. Pierre knew or should have known that such conduct would cause Plaintiff severe emotional distress.

186.    Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

187.    Mr. Combs' and Mr. Pierre's ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the same. Accordingly, Mr. Combs and Mr. Pierre are estopped from asserting the defense of the statute of limitations due to the duress they exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

**ELEVENTH CAUSE OF ACTION**
**Sexual Harassment, Gender Discrimination, and Hostile Work Environment under**
**New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq*. ("NYSHRL")**
***Against Sean Combs***

188.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

189.    Mr. Combs discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment, verbal abuse, systematic exclusion, failure to address complaints of discrimination and/or harassment, retaliation, derogatory gender-based slurs and comments, insults and offensive gender-based language, intimidation and bullying, threats, unfair treatment, and denial of opportunities, promotions, or benefits based on gender.

190.    As a direct and proximate result of Mr. Combs' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has sustained and will continue to sustain, monetary and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

191.    Mr. Combs' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

192.    Mr. Combs' ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the same. Accordingly, Mr. Combs is estopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

**TWELFTH CAUSE OF ACTION**
**Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York City Human Rights Law, N.Y. Exec. Law §§ 8-101, *et seq*. ("NYCHRL")**
***Against Sean Combs***

193.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

194.    Mr. Combs discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to unwanted touching of her intimate parts, forcing Plaintiff to endure derogatory name-calling, and exposing Plaintiff to sex trafficking and sex acts, constituting a hostile work environment. Mr. Combs engaged in a pattern of criminal conduct in the workplace that created an offensive, intimidating, and hostile atmosphere for Plaintiff based on her gender.

195.    As a direct and proximate result of Mr. Combs' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

196.    Mr. Combs' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

197.    Mr. Combs' ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the same. Accordingly, Mr. Combs is estopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

### THIRTEENTH CAUSE OF ACTION
### Retaliation in Violation of New York State Human Rights Law, ("NYSHRL") Section 296 and California Government Code Section 12940(h).
#### *Against Sean Combs*

198.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

199. Plaintiff engaged in protected activity by rejecting Mr. Combs' sexual advances, which constitutes opposition to unlawful sexual harassment under New York State Human Rights Law (NYSHRL), Section 296. This rejection is protected activity under NYSHRL and California Government Code, as it opposes discriminatory conduct in the workplace.

200. Mr. Combs' persistent denial of prominent or continuing singing/writing/performing roles as to Plaintiff constitutes adverse employment actions. Plaintiff's rejection of Combs' sexual advances subjected her to an increasingly hostile work environment based on her gender. These actions materially and detrimentally affected Plaintiff's terms and conditions of employment, and were in direct response to Plaintiff's protected activity of rejecting Combs' sexual advances.

201. Further, Mr. Combs' failure to pay Ms. Richard earned wages, royalties, and concert and promotional appearance fees according to contracts and other promises constitute adverse employment actions based on gender and were done in retaliation by Mr. Combs.

202. There is a direct causal connection between Plaintiff's protected activity and Mr. Combs' adverse employment action. The timing and circumstances indicate Mr. Combs' retaliatory motives.

203. As a direct and proximate result of Mr. Combs' retaliation, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

204. Mr. Combs' unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

205. Mr. Combs' ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the

same. Accordingly, Mr. Combs is estopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

### FOURTEENTH CAUSE OF ACTION
### Hostile Work Environment in violation of California Government Code §12940
### *Against Sean Combs*

206.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

207.    Mr. Combs subjected Plaintiff to sexual harassment on the basis of her gender in violation of California Government Code § 12940, including unwanted touching of her intimate parts, forcing Plaintiff to endure derogatory name-calling, and exposing Plaintiff to sex trafficking and sex acts, all of which constituted a hostile work environment.

208.    The conduct of Mr. Combs created an intimidating, hostile, and offensive working environment in violation of California Government Code §12923.

209.    As a direct and proximate result of Mr. Combs' unlawful conduct in violation of Cal. Gov. Code § 12940, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

210.    Mr. Combs' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Cal. Gov. Code § 12940 for which Plaintiff is entitled to an award of punitive damages.

211.    Mr. Combs' ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the same. Accordingly, Mr. Combs is estopped from asserting the defense of the statute of limitations

due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

## FIFTEENTH CAUSE OF ACTION
### Gender Discrimination in Violation of California Government Code §12940
### *Against Sean Combs*

212.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

213.    Mr. Combs discriminated against Plaintiff on the basis of her gender in violation of California Government Code § 12940 by subjecting Plaintiff to disparate treatment, verbal abuse, systematic exclusion, failure to address complaints of discrimination and/or harassment, retaliation, derogatory gender-based slurs and comments, insults and offensive gender-based language, intimidation and bullying, threats, unfair treatment, and denial of opportunities, promotions, or benefits based on her gender.

214.    As a direct and proximate result of Mr. Combs' unlawful discriminatory conduct in violation of Cal. Gov. Code § 12940, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

215.    Mr. Combs' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under Cal. Gov. Code § 12940 for which Plaintiff is entitled to an award of punitive damages.

216.    Mr. Combs' ongoing threats and coercive actions deterred Plaintiff from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out and come forward against Mr. Combs, somewhat alleviating Plaintiff's fears and enabling her to do the same. Accordingly, Mr. Combs is estopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

**SIXTEENTH CAUSE OF ACTION**
**Violation of Right of Publicity Under New York Civil Rights Law**
**§ 50 and § 51 and Unjust Enrichment**
***Against Sean Combs***

217.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

218.    Mr. Combs demanded and required that Ms. Richard perform at and attend numerous parties and promotional events as part of *Diddy – Dirty Money*, including very late hours or even overnight.  These events and parties were often agreed to by Mr. Combs and a third party, i.e. CIROC Vodka, or others pursuant to the aforementioned deal between Combs Entities, Bad Boy and Interscope Records.   These promotional events had the effect of binding Ms. Richard as part of the promotion of DiddyBeats, FlipCamera, National Football League (NFL) and Major League Baseball (MLB) World Series as part and parcel of Mr. Combs' personal or company agreements with various entities.

219.    Mr. Combs knowingly used Ms. Richard's voice, likeness, image, persona and services without Ms. Richard's consent for advertising and promotion purposes and for the purpose of trade, and without remuneration to Ms. Richard.

220.    Mr. Combs has been unjustly enriched at Ms. Richard's expense by using Ms. Richard's voice, image, likeness, and persona without compensating Ms. Richard.

221.    It would be inequitable for Mr. Combs to retain the benefit conferred by the unauthorized use of Ms. Richard's voice, image, likeness, and persona.

222.    As a result of Mr. Combs' unauthorized use of Ms. Richard's likeness, image, and persona, Ms. Richard has suffered damages and is entitled to restitution in an amount to be determined at trial.

223.    Mr. Combs' ongoing threats and coercive actions deterred Ms. Richard from asserting her legal rights until late 2023, when other victims of Mr. Combs began to speak out

and come forward against Mr. Combs, somewhat alleviating Ms. Richard's fears and enabling her to do the same. Accordingly, Mr. Combs  is estopped from asserting the defense of the statute of limitations due to the duress he exerted upon Plaintiff which prevented her from bringing her legal claims within the statutorily proscribed period.

**SEVENTEENTH CAUSE OF ACTION**
**Copyright Infringement**
**17 U.S.C. § 106**
***Against Sean Combs and Love Records, Inc.***

224.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

225.    Ms. Richard alleges that Defendants Sean Combs and Love Records, Inc.,  had access to *Deliver Me*, as it was created and recorded by Plaintiff in 2009 with Mr. Combs and/or his companies; furthermore, the presentation of the *Deliver Me* Contract by Defendants Sean Combs and Love Records, Inc. to Ms. Richard acknowledged Ms. Richard's contribution to the song *Deliver Me*.

226.     Ms. Richard further alleges that Defendants Sean Combs and Love Records, Inc.  produced, copied, reproduced, published, distributed, transmitted, performed, licensed, and or/otherwise used Ms. Richard's original elements, musical composition, sound recording and performance in *Deliver Me* without authorization, consent or a license from Ms. Richard.

227.    Due to Defendants Sean Combs and Love Records, Inc. and each of their acts of copyright infringement, Ms. Richard has suffered damages in an amount to be established at trial.

228.    Due to Defendants Sean Combs and Love Records, Inc. and each of their acts of copyright infringement, Sean Combs and Love Records, Inc. and each of them, have obtained and continue to obtain profits from the exploitation of *Deliver Me* they would not have realized but for their infringement of Ms. Richard's copyrights in and to *Deliver Me*. As such, Ms. Richard is entitled to disgorgement of Sean Combs and Love Records, Inc. and each of their

profits attributable to the infringement of Ms. Richard's copyrights in and to *Deliver Me* in an amount to be established at trial.

229.    Upon information and belief, Ms. Richard alleges that Sean Combs and Love Records, Inc. and each of them, have committed copyright infringement with actual or constructive knowledge of, or have recklessly disregarded Ms. Richard's copyrights in and to *Deliver Me*, such that said acts of copyright infringement were, and continue to be, willful, intentional, and malicious.

230.    As an alternative, Plaintiff is entitled to the maximum statutory damages which copyright registration confers upon a copyright owner, pursuant to 17 U.S.C. §504(c), in the amount of $150,000.00 with respect to each of Defendants Sean Combs and Love Records, Inc., for each work infringed, or for such other amounts as may be proper under 17 U.S.C. §504(c).

## EIGHTEENTH CAUSE OF ACTION
### Vicarious and/or Contributory Copyright Infringement
### 17 U.S.C. § 106
### *Against Sean Combs, Love Records, Inc.,*
### *Janice Combs Publishing LLC, and Janice Combs Publishing Holdings Inc.*

231.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

232.    Upon information and belief, Ms. Richard alleges that Defendants Sean Combs, Love Records, Inc.,  Janice Combs Publishing LLC, and Janice Combs Publishing Holdings Inc. and each of them, knowingly induced, participated in, aided, abetted, and/or profited from the unauthorized copying, reproduction, publication, distribution, transmission, public performance, licensing, creation of derivative works of, and/or any other use in *Deliver Me* of the original elements of *Deliver Me.*

233.    Upon information and belief, Ms. Richard alleges that Defendants Sean Combs,

Love Records, Inc., Janice Combs Publishing LLC, and Janice Combs Publishing Holdings Inc, and each of them, had the right and ability to supervise the creation and exploitation of *Deliver Me* and/or had a direct financial interest in the same.

234.  Due to the acts of Defendants Sean Combs, Love Records, Inc. Tri Star Sports and Entertainment Group, Inc. Janice Combs Publishing, LLC and Janice Combs Publishing Holdings Inc. of vicarious and/or contributory copyright infringement, Ms. Richard has suffered damages in an amount to be established at trial.

235.    Due to the acts of Defendants Sean Combs, Love Records, Inc., Janice Combs Publishing, LLC and Janice Combs Publishing Holdings Inc. in contributory copyright infringement, each of the aforesaid Defendants have obtained, and continue to obtain, profits from the exploitation of *Deliver Me* they would not have realized but for their infringement of Ms. Richard's copyrights in and to *Deliver Me*. As such, Ms. Richard is entitled to disgorgement of each of the aforesaid Defendants' profits attributable to the infringement of Ms. Richard's copyrights in and to *Deliver Me* in an amount to be established at trial.

236.    Upon information and belief, Ms. Richard alleges that Defendants Sean Combs, Love Records, Inc., Janice Combs Publishing, LLC and Janice Combs Publishing Holdings Inc., and each of them, have committed vicarious and/or contributory copyright infringement with actual or constructive knowledge of, or have recklessly disregarded, Ms. Richard's copyrights in and to *Deliver Me*, such that said acts of copyright infringement were, and continue to be, willful, intentional, and malicious.

237.    As an alternative, Plaintiff is entitled to the maximum statutory damages which copyright registration confers upon a copyright owner, pursuant to 17 U.S.C. §504(c), in the amount of $150,000.00 with respect to each of Defendants Sean Combs, Love Records, Inc., Janice Combs Publishing, LLC and Janice Combs Publishing Holdings Inc. for each work infringed, or for such other amounts as may be proper under 17 U.S.C. §504(c).

**PRAYER FOR RELIEF ON CLAIMS**

WHEREFORE, Ms. Richard prays that this Court enter judgment against Defendants herein and any other Defendants who may later be added to this action as follows:

1.  That aforementioned Defendants have directly and/or secondarily infringed Ms. Richard's copyrights in and to *Deliver Me* through the unauthorized publication and exploitation of *Deliver Me*, absent a license delineating Ms. Richard's percentage interests in *Deliver Me*.

2.  That Defendants, and each of them, their respective agents, and anyone else working in concert with Defendants and/or their agents, be enjoined from copying, reproducing, publishing, distributing, transmitting, publicly performing, licensing, creating derivative works of, and/or otherwise using *Deliver Me*'s original elements, and/or any work containing elements that are strikingly or substantially similar thereto, without a license, authorization, or consent from Ms. Richard.

3.  That a constructive trust be entered over any and all materials (e.g., sound recordings, video reproductions, etc.) used in connection with the creation and exploitation of *Deliver Me*, and all revenues and profits resulting therefrom, for the benefit of Ms. Richard;

4.  For a money judgment representing compensatory damages, including but not limited to: consequential damages, lost wages, earning, royalties, publishing, touring and promotional income, and non-economic damages, and all other sums of money, together with interest on these amounts, according to proof;

5.  For a money judgment for mental pain and anguish and severe emotional distress, according to proof;

6.  For restitution;

7.  For disgorgement of all sums unjustly obtained from Plaintiff or inured to the benefit of Defendants;

8.  For civil penalties;

9.  For punitive and exemplary damages according to proof;

10. For attorneys' fees and costs;

11. For prejudgment and post-judgement interest; and

12. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

238. Ms. Richard demands a trial by jury on all issues triable of right by jury.

DATED:  August 23, 2025

Respectfully submitted,

**THE BLOOM FIRM**

By: /s/ <u>Lisa Bloom</u>
Lisa Bloom
Arick Fudali
Yasmine Meyer
Devin Meepos
Attorneys for Ms. Richard

**IP LEGAL STUDIO LLC**

By:  /s/ <u>Lisa A. Cervantes</u>
Lisa A. Cervantes

Attorneys for Ms. Richard