UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

DAWN ANGELIQUE RICHARD,

                            Plaintiff,

            -v.-

SEAN COMBS, HARVE PIERRE,
JANICE COMBS PUBLISHING LLC,
JANICE COMBS PUBLISHING
HOLDINGS INC., LOVE RECORDS
INC., DOE CORPORATIONS 1-10, and
DOE DEFENDANTS 11-20,

                        Defendants.

24 Civ. 6848 (KPF)

**OPINION AND ORDER**

---------------------------------------------------------------

KATHERINE POLK FAILLA, District Judge:

Plaintiff Dawn Angelique Richard is a musician and performer. From 2004 to 2012, she worked with Sean Combs — more commonly known by his various stage names, including "P. Diddy." Initially Plaintiff was a member a "girl group" managed by Mr. Combs, Danity Kane, and later she performed alongside Mr. Combs in a musical trio known as Diddy – Dirty Money. In 2024, more than a decade after effectively severing ties with Mr. Combs, Plaintiff sued him, his business associate Harve Pierre, and Combs-related entities Janice Combs Publishing LLC, Janice Combs Publishing Holdings Inc., and Love Records Inc. (collectively, "Defendants"), as well as unnamed corporations and individuals. In her operative complaint, the Second Amended Complaint (or "SAC"), Plaintiff alleges eighteen claims against Defendants — primarily tort claims arising from Mr. Combs's alleged emotional abuse and manipulation, as well as claims for copyright infringement. Before the Court is

Defendants' motion to dismiss the SAC.  For the reasons that follow, the Court grants Defendants' motion, dismissing seventeen of Plaintiff's claims with prejudice and one without prejudice to its refiling in state court.

**BACKGROUND**[1]

### A.    Factual Background

#### 1.    Mr. Combs Cultivates an Environment of Abuse and Exploitation

Plaintiff first came to know Mr. Combs in 2004, when she participated in a reality TV show, *Making The Band*, which depicted the formation and development of a new musical group under his mentorship.  (SAC ¶ 18). Plaintiff was selected for the group, which became known as Danity Kane.  (*Id.* ¶ 21).  Although Danity Kane would eventually disband in late 2009, Plaintiff soon thereafter formed Diddy – Dirty Money with Mr. Combs and another woman, referred to in the pleadings as "Witness 1."  (*Id.* ¶ 46).  Plaintiff's participation in Diddy – Dirty Money lasted until 2011 or 2012.  (*See id.* ¶¶ 76, 79 (alleging misconduct until 2011); Pl. Opp. 3 (stating that "Plaintiff's work with Combs ceased in 2012")).  Plaintiff alleges that her approximately eight-year association with Mr. Combs across these two groups was suffused with abuse, manipulation, and violence.

---

[1]    This Opinion draws its facts from the Second Amended Complaint ("SAC" (Dkt. #172)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #175); to Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #176); and to Defendants' memorandum of law in reply as "Def. Reply" (Dkt. #177).

2

To start, Mr. Combs would routinely disparage and demean Plaintiff and other women.  He would call them "fat," "ugly," "bitches," "whore[s]," and "hoes."  (SAC ¶¶ 28, 76-77).  Mr. Combs would hold meetings in his underwear to assert power and dominance.  (*Id.* ¶ 44).  And when Plaintiff asked him to clothe himself, Mr. Combs would angrily refuse and make Plaintiff feel embarrassed and powerless.  (*Id.*).

Mr. Combs also cultivated a dynamic of control and manipulation.  He regularly deprived Plaintiff and her bandmates of food and sleep.  (SAC ¶ 35).  Mr. Combs would force them to record and rehearse for days on end.  (*Id.* ¶ 36 ("36 to 48 hours without breaks"); *id.* ¶ 63 ("three to four consecutive days recording without a break to eat or sleep")).  When Plaintiff and her bandmates requested meals or rest, Mr. Combs would refuse and demean them with comments like, "[Y]ou bitches don't want this," "[Y]'all are not hungry enough," and "I'm paying you bitches to work."  (*Id.* ¶ 35).  He would further threaten Plaintiff with threats such as "I make n****s go missing" and "I make things go away."  (*Id.* ¶ 64).  On those occasions when Plaintiff attempted to leave the studio, Mr. Combs would reiterate these threats and demand, "[W]here the fuck are you? … [W]e have an album to make."  (*Id.*).  And at the same time that Mr. Combs denied Plaintiff's requests for food, he would criticize her for being "too skinny" and would demand that she consume peanut butter shakes.  (*Id.* ¶ 65).  This grueling environment caused Plaintiff health complications that eventually led to her hospitalization — news that Mr. Combs disregarded, instead promptly ordering her back to the studio.  (*Id.* ¶ 68).

3

Mr. Combs's demeaning behavior undermined Plaintiff's confidence; she perceived Mr. Combs as wielding significant control over her career and financial security, leading her to gradually accept these conditions as normal. (*See* SAC ¶¶ 35-37, 63, 68).  Indeed, both Mr. Combs and Mr. Pierre made clear that there would be severe repercussions if anyone failed to comply with Mr. Combs's orders.  (*Id.* ¶ 70).

### 2.   Mr. Combs Displays Physical Violence

Plaintiff's work environment was also explicitly violent.  On multiple occasions, Mr. Combs violently abused other women in front of Plaintiff.  (SAC ¶¶ 30, 49-50).  For example, during the recording of a Diddy – Dirty Money album at Mr. Combs's home in Los Angeles, Plaintiff and Witness 1 witnessed Mr. Combs physically and verbally abuse his girlfriend, Casandra "Cassie" Ventura.  (*Id.* ¶ 49).  Mr. Combs pushed Ms. Ventura against a wall and choked her, attempted to strike her with a pan of eggs she had been preparing for him, then repeatedly punched and kicked her and dragged her up the stairs.  (*Id.*). Witnessing this interaction frightened Plaintiff, who was unable to sleep that evening due to worrying about Ms. Ventura and about her own safety.  (*Id.* ¶ 50).

The following day, Plaintiff and Witness 1 were summoned back to Mr. Combs's residence.  (SAC ¶ 51).  Mr. Combs locked the women in his home studio, dimmed the lights, and gave them flowers.  (*Id.*).  He told them, "I'm giving you an opportunity[;] if you want to make it, you'll shut your mouth." (*Id.*).  And, lest his point be lost, Mr. Combs added, "people end up missing."

(*Id.*).  Confined in a small space with Mr. Combs after having just observed him violently abuse Ms. Ventura, Plaintiff was scared and believed that Mr. Combs would follow through on his threats.  (*Id.*).

Later, Plaintiff and Witness 1 tried to encourage Ms. Ventura to escape her relationship with Mr. Combs.  (SAC ¶ 62).  Mr. Combs learned of these efforts and became enraged, screaming threats at Plaintiff and Witness 1 that included:  "Y'all bitches don't get in my relationship," "Don't tell my bitch [Ms. Ventura] what she need to be doing," "Just make money and shut the fuck up," "I end artists," "I shelve careers," "You could be missing," and "You bitches want to die today[?]"  (*Id.*).

Further exacerbating the constant threat of violence Plaintiff endured was the fact that Mr. Combs and his bodyguards routinely carried firearms.  (SAC ¶ 71).  The presence of these deadly weapons combined with Mr. Combs's violent outbursts and threats on Plaintiff's life to create an atmosphere of fear and intimidation that coerced Plaintiff into continuing to work under inhumane conditions.  (*Id.* ¶ 73).

For Plaintiff, the threat of physical violence came to a head in December 2010, when Diddy – Dirty Money was preparing for a performance on *Saturday Night Live*.  Mr. Combs summoned Plaintiff and Witness 1 to a studio in Manhattan where he, his bodyguard, and Mr. Pierre were waiting in the lobby.  (SAC ¶¶ 91-92).  Immediately upon their arrival, Mr. Combs began screaming obscenities at them and questioning where they had been.  (*Id.* ¶ 92).  Plaintiff

5

saw bystanders taking notice and, embarrassed, asked Mr. Combs to stop calling them "bitches" in front of everyone. (*Id.*).

In response, Mr. Combs raised his arm and swung his fist toward Plaintiff's face. (SAC ¶ 93). Mr. Pierre and the bodyguard shouted at Plaintiff, and Mr. Pierre also swung his hand toward Plaintiff's face. (*Id.*). But before Plaintiff was struck, the bodyguard grabbed Plaintiff and escorted her out of the lobby. (*Id.*). Witness 1 rushed after Plaintiff, and the bodyguard locked both women in a Bentley parked outside. (*Id.*). Plaintiff was terrified: there were no interior door handles; her belongings were in the studio, including her phone and jacket; and it was late evening in the wintertime, but the car was off, and there was no heat and minimal light. (*Id.* ¶¶ 94-95).

Plaintiff eventually managed to contact her father using Witness 1's phone. (SAC ¶ 94). Even after Plaintiff's father arrived, Mr. Pierre kept Plaintiff locked alone in another room for a period of time. (*Id.* ¶ 94). Eventually, Mr. Pierre allowed Plaintiff's father to see her. (*Id.*). Mr. Combs and Mr. Pierre warned him to "think about your family" and "about your daughter's career." (*Id.* ¶ 98). To Plaintiff, Mr. Combs privately warned: "[Y]ou don't call your Dad unless you're in the hospital." (*Id.* ¶ 99).

### 3. Mr. Combs Engages in Sexual Misconduct

Separately, Plaintiff was exposed to repeated sexual misconduct — both as witness and victim. She was regularly subjected to drug-fueled parties where Mr. Combs and his friends would perform sexual acts on incapacitated young women. (SAC ¶¶ 52-56). Mr. Combs hired police officers to attend these

parties, both to signal that his influence extended to law enforcement and to tacitly warn that reporting him to authorities would be futile. (*Id.* ¶ 55). And he kept the doors locked and guarded, making it difficult for Plaintiff to leave. (*Id.*).

As another example of the sexual misconduct Plaintiff witnessed, while on tour in Glasgow, Scotland, Plaintiff saw Mr. Combs and several other men having group sex with one of Mr. Combs's female assistants at a hotel pool. (SAC ¶ 85). On their flight back to the United States the next day, however, when Plaintiff asked Mr. Combs where the assistant was, he replied, "I don't give a fuck where that bitch is." (*Id.* ¶ 86). Plaintiff later learned that Mr. Combs had taken the assistant's passport with him, leaving her stranded in the United Kingdom. (*Id.*).

Plaintiff also was subjected to sexual misconduct herself. During preparations for the tour, Mr. Combs would often intrude into Plaintiff's changing room unannounced and make sexual advances toward her. (SAC ¶ 79). While Plaintiff was undressed, he would grope her bare buttocks and chest and coerce her with fraudulent promises that he would ensure her professional success if she complied. (*Id.* ¶¶ 80-81).

Despite the threats, physical violence, and sexual misconduct, Diddy – Dirty Money achieved financial success through record sales, performances, and promotional appearances. (SAC ¶¶ 74-75). Still, while Plaintiff toured with the group and participated in the promotional appearances, she was never appropriately compensated. (*Id.* ¶ 75). To make matters worse, Mr. Combs

frequently ordered her to perform at a moment's notice — demands Plaintiff felt unable to decline because they were accompanied by implicit or explicit threats. (*Id.*).

### 4.    Mr. Combs and Love Records Publish *Deliver Me* Without Plaintiff's Consent

In 2009, Plaintiff wrote lyrics and performed vocals on the collaborative song *Deliver Me* with Mr. Combs, Witness 1, and another artist, Busta Rhymes. (SAC ¶ 108).  Plaintiff wrote the first verse, an interlude, and the chorus. (*Id.*). The four collaborators agreed to split the proceeds of the song equally, allocating 21% to each of them and reserving the remaining 16% for another artist whose work provided the underlying track to the song. (*Id.* ¶ 109).

For over a decade after its creation, *Deliver Me* remained unpublished and in the possession of Mr. Combs and his companies. (SAC ¶ 113).  But in 2022 or 2023, Mr. Combs wished to include the song in a new album. (*Id.*).  In August 2023, Plaintiff received a proposed contract from Mr. Combs's companies seeking to negotiate Plaintiff's artist's percentage in the song. (*Id.* ¶¶ 100-102, 114-115).  Mr. Combs also called Plaintiff directly to negotiate, although his negotiating tactics including leaving a threatening voicemail. (*Id.* ¶¶ 101, 116).  Because Plaintiff sought the 21% she believed the collaborators originally agreed to, she declined to execute the proposed contract. (*Id.* ¶¶ 102-103, 115, 118).  Love Records Inc. (Mr. Combs's record company and a co-Defendant) did not execute the contract either. (*Id.* ¶¶ 103, 115, 118).

In September 2023, Mr. Combs and his companies publicly released *Deliver Me* without Plaintiff's agreement and without compensating her. (SAC

8

¶¶ 104, 118).  Plaintiff did, however, negotiate and receive a $25,000 featured-artist flat fee that she informed all parties would remain in a client trust account and would not be disbursed until the *Deliver Me* contract was fully executed.  (*Id.* ¶¶ 118-119).

*Deliver Me* achieved strong commercial success and helped garner Mr. Combs his first Grammy nomination as a lead artist.  (SAC ¶ 121).  On November 6, 2023, Plaintiff registered *Deliver Me* with the United States Copyright Office and listed her collaborators.  (*Id.* ¶ 110; *see also* Dkt. #130-1 (copyright certificate of registration)).

## B.    Procedural Background

This case commenced on September 10, 2024, when Plaintiff filed her original complaint.  (Dkt. #2).  On March 12, 2025, Plaintiff filed a First Amended Complaint, dismissing several claims and revising the corporate defendants.  (Dkt. #130).  Plaintiff sought leave to amend her complaint once more following Mr. Combs's criminal trial and a New York state court decision interpreting the statute under which Plaintiff advanced her first claim, the Victims of Gender-Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101 to 10-1107 (the "VGMVPL").  (*See* Pl. Opp. 2; Dkt. #162).  The Court granted Plaintiff's request (Dkt. #168), and on August 23, 2025, Plaintiff filed the operative SAC (Dkt. #172).

The SAC alleges eighteen claims.  (SAC ¶¶ 127-237).  Count One is the VGMVPL claim, which Plaintiff brings against Mr. Combs and Mr. Pierre.  (*Id.* ¶¶ 127-133).  Counts Two through Sixteen relate to the alleged physical and

sexual abuse Plaintiff experienced while working with Mr. Combs and Mr. Pierre.  (*See id.* ¶¶ 134-223).  They include allegations under New York, California, and federal law for assault, battery, sexual assault, sex trafficking, false imprisonment, forced labor, and other employment-related torts.  (*Id.*).  Counts Seventeen and Eighteen allege copyright infringement against Mr. Combs, Love Records, Inc., Janice Combs Publishing LLC, and Janice Combs Publishing Holdings Inc.  (*Id.* ¶¶ 224-237).

Defendants submitted a consolidated motion to dismiss the SAC on October 8, 2025.  (Dkt. #173-175).  Plaintiff submitted her opposition on November 5, 2025.  (Dkt. #176).  Defendants replied on November 19, 2025.  (Dkt. #177).  Thereafter, the parties filed several letters providing notice and disputing the relevance of certain supplemental authorities.  (Dkt. #180-183, 185).

**DISCUSSION**

**A.    Applicable Law**

Defendants seek dismissal of Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  When considering such a motion, a court "draw[s] all reasonable inferences in [a plaintiff's] favor, assume[s] all well-pleaded factual allegations to be true, and determine[s] whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  A plaintiff is

10

entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). Nevertheless, the court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)). Indeed, plaintiffs must do more than provide a "formulaic recitation of the elements of a cause of action" — that is, their "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## B.    Analysis

### 1.    Counts Two Through Sixteen Are Time-Barred

The respective statutes of limitations for Counts Two through Sixteen have expired. Indeed, the vast majority are more than a decade stale. Counts Two and Six through Ten allege assault, battery, false imprisonment, and intentional infliction of emotional distress under New York and California law. (SAC ¶¶ 134-138, 160-187). These claims are subject to a one-year statute of limitations under New York law, N.Y. C.P.L.R. § 215(3); *see also Gilmore* v. *Combs*, No. 24 Civ. 8440 (JPO), 2025 WL 1425326, at *3 (S.D.N.Y. May 16, 2025), and to the extent that California law provides a longer limitations period, New York law controls, *Stuart* v. *Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998) (discussing New York's "borrowing statute," N.Y. C.P.L.R. § 202, in context of diversity action); *see also Conn. Gen. Life Ins. Co.* v. *BioHealth Lab'ys, Inc.*, 988 F.3d 127, 137 (2d Cir. 2021) ("[I]t is beyond cavil that federal

courts apply state limitations rules to state-law claims regardless of the jurisdictional circumstances.").[2]  The causes of actions for these torts typically accrue "on the date of the alleged incident," *Gilmore*, 2025 WL 1425326, at *3 (internal quotation marks and citation omitted), but even if they accrued at a later point "on the date of the last wrongful act," *Leonhard* v. *United States*, 633 F.2d 599, 613 (2d Cir. 1980), the claims were stale by 2012 or 2013 at the latest (*see* SAC ¶¶ 76, 79 (alleging misconduct until 2011); Pl. Opp. 3 (stating that "Plaintiff's work with Combs ceased in 2012")).

Counts Three and Four allege violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1581-1597.  (SAC ¶¶ 139-152).  The statute of limitations for these claims is "10 years after the cause of action arose."  18 U.S.C. § 1595(c)(1); *see also Levin* v. *Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 669-70 (S.D.N.Y. 2024).  The cause of action arose in 2011 or 2012 at the latest (*see* SAC ¶¶ 76, 79; Pl. Opp. 3), so the statute of limitations ran in 2021 or 2022.

---

[2]    "In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." *Martin Hilti Fam. Tr.* v. *Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 350 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).  Plaintiff brings Counts Two and Nine under California law (SAC ¶¶ 134-138, 177-181), but Defendants assert that under New York choice-of-law rules, substantive New York law applies to the timeliness of those claims.  (Def. Br. 7 n.1).  Plaintiff does not contest the point.  (*See* Pl. Opp. 4-12).  Accordingly, the Court applies New York law to these claims.  *See Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (noting that the parties' "implied consent ... is sufficient to establish choice of law" (internal quotation marks and citation omitted)); *see also Valentini* v. *Grp. Health Inc.*, No. 20 Civ. 9526 (JPC), 2021 WL 2444649, at *6 (S.D.N.Y. June 15, 2021) ("The parties do not dispute that New York law applies in this case, and the Court accordingly applies that law."), *aff'd*, No. 22-157, 2023 WL2027273 (2d Cir. Feb. 16, 2023) (summary order).

Count Five alleges a violation of the California Trafficking Victims Protection Act, Cal. Civil Code § 52.5.  (SAC ¶¶ 153-159).  The applicable statute of limitations is "seven years [from] the date on which the trafficking victim was freed from the trafficking situation." Cal. Civ. Code § 52.5(c).  Plaintiff's claim thus expired in 2018 or 2019.  (*See* SAC ¶¶ 76, 79; Pl. Opp. 3).

Counts Eleven through Fifteen assert employment discrimination claims — for sexual harassment, gender discrimination, hostile work environment, and retaliation — in violation of New York and California laws. (SAC ¶¶ 188-216).  New York law controls, *see Stuart*, 158 F.3d at 627; *Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000), which applies a three-year statute of limitations, *Satina* v. *City of New York*, No. 24 Civ. 1842 (JGLC), 2025 WL 902893, at *3 (S.D.N.Y. Mar. 25, 2025).  These claims therefore expired in 2014 or 2015.  (*See* SAC ¶¶ 76, 79; Pl. Opp. 3).

Count Sixteen alleges a violation of Plaintiff's right of publicity under Sections 50 and 51 of the New York Civil Rights Law ("NYCRL"), as well as unjust enrichment.  (SAC ¶¶ 217-223).  The NYCRL claim is subject to a one-year statute of limitations, *Fischer* v. *Forrest*, No. 14 Civ. 1304 (PAE) (AJP), 2017 WL 1063464, at *5 (S.D.N.Y. Mar. 21, 2017), and so is the related unjust enrichment claim, *Spirt* v. *Spirt*, 211 N.Y.S.3d 910 (N.Y. Sup. Ct. 2024) ("[W]hen a cause of action for unjust enrichment is based upon the same facts as … another cause of action, the unjust enrichment claim is subject to the same statute of limitations as [that] cause of action.").  Plaintiff argues that these claims arose from her participation in performances and promotional events for

13

Diddy – Dirty Money, not from the alleged copyright infringement related to the publishing of *Deliver Me* (*see* SAC ¶¶ 217-223; Pl. Opp. 16-17), and thus the statute of limitations for Count Sixteen ran in 2012 or 2013 (*see* SAC ¶¶ 76, 79; Pl. Opp. 3).

Because Plaintiff did not commence this lawsuit until September 10, 2024, Counts Two through Sixteen would appear to be time-barred — most by more than a decade. Plaintiff concedes that the statutes of limitations on these claims have run. (*See* SAC ¶¶ 145, 152, 157, 165, 170, 176, 181, 187, 192, 197, 205, 211, 216, 223; Pl. Opp. 4, 10 (admitting to Plaintiff's "delay in filing" and attempting to justify why Plaintiff did not "[t]imely fil[e]")). She argues, however, that various tolling doctrines save them — namely, duress tolling under state law, equitable estoppel under state law, and equitable tolling under federal law. (Pl. Opp. 4-12).[3] Ultimately, the Court is not persuaded that these doctrines salvage any of Plaintiff's claims.

Plaintiff conflates the three tolling doctrines in her complaint and briefing. (*See* SAC ¶¶ 145, 152, 165, 170, 176, 181, 187, 192, 197, 205, 211, 216, 223 (arguing that Mr. Combs and Mr. Pierre are "*estopped* from asserting the defense of the statute of limitations due to the *duress* [they] exerted upon Plaintiff which prevented her from bringing her legal claims within the

---

[3]    While Plaintiff does not plead that the statute of limitations has run for Count Two (*see* SAC ¶ 136), her explanation for why the claim is timely is substantially similar to her arguments for why various tolling doctrines should revive Counts Three through Sixteen. Consequently, and because the Court has independently concluded that Count Two has expired, the Court will analyze all the claims (Counts Two through Sixteen) together.

statutorily pr[e]scribed period" (emphases added)); *id.* ¶¶ 136, 157 (similar); (Pl. Opp. 4-7 (making duress and equitable tolling arguments in the "Equitable Estoppel" section)). There is logic to that conflation: The parties largely center their arguments on an issue ostensibly common to each doctrine — whether Mr. Combs's and Mr. Pierre's threats persisted from the time they were made until the time Plaintiff filed her complaint, such that they (i) constitute a continuous wrong or an extraordinary circumstance that deterred Plaintiff from timely filing and (ii) justify the tolling of the statutes of limitations periods. (*See* Def. Br. 10-12; Pl. Opp. 4-12; Def. Reply 1-6). As it happens, however, the tolling doctrines are analytically distinct, and thus the Court addresses each separately. *See Gilmore*, 2025 WL 1425326, at *3 (addressing "questions of equitable estoppel, retaliation tolling, and duress tolling" separately).

### a.    Duress Tolling Does Not Revive Plaintiff's Claims

*First*, Plaintiff invokes duress tolling. Under New York law, duress tolling requires (i) "threats or force by the defendant" and (ii) "the submission of the plaintiff's free will to those threats." *Overall* v. *Est. of Klotz*, 52 F.3d 398, 404 (2d Cir. 1995). Additionally, a plaintiff must "be subjected to a continuous wrong for duress tolling to be appropriate." *Id.* (internal quotations marks and citation omitted). In other words, duress tolling examines whether the parties' conduct "constitutes a continuation of the underlying tort," and requires that "the tortious conduct ... continue uninterrupted." *Id.* at 404-05. Operating in the background, however, is the principle that "New York construes tolling doctrines as narrowly as possible." *Id.* at 404.

15

Plaintiff does not make clear which claims she seeks to save with duress tolling, but she agrees with this description of the standard. (Pl. Opp. 7). To the extent Plaintiff seeks to apply this doctrine to her California state-law claims (*see id.* at 8 (citing, in her "Estoppel by Duress" section, *Bianco* v. *Warner*, 562 F. Supp. 3d 526, 534 (C.D. Cal. 2021), a case applying equitable estoppel to claims under California law)), she does not argue that a different standard applies. Consequently, the Court will analyze duress tolling only under this New York standard. *See Krumme,* 238 F.3d at 138 (noting that the parties' "implied consent … is sufficient to establish choice of law" (internal quotation marks and citation omitted)).

In brief, Plaintiff's duress tolling argument is that Mr. Combs's "specific, repeated, and targeted death threats" constituted a continuous wrong causing "an indefinite fear of retaliation" that deterred her from timely filing. (Pl. Opp. 7-8). Because Mr. Combs's willingness and ability to act on his threats never ceased, Plaintiff argues, their coercive effect on Plaintiff never lifted and thus duress tolling should render her claims timely. (*Id.* at 8). But while Plaintiff's argument has superficial appeal, it fails to engage with the actual legal requirements of the doctrine.

In general, duress tolling requires that the tortious conduct for which the plaintiff is suing must continue uninterrupted through the limitations period. *Overall,* 52 F.3d at 404-07. This is why, as "shorthand" for the continuous-wrong requirement, courts have explained "that duress tolling is available only when duress is an element of the cause of action alleged." *Id.* at 404. Thus,

16

where a plaintiff's "father did not threaten or abuse her" for over forty years, duress tolling did not revive her expired claims for assault and battery, false imprisonment, and intentional infliction of emotional distress — even though the threats and abuse caused plaintiff "amnesia" that prevented her from sooner "unearth[ing] long-hidden memories." *Id.* at 400, 402. Because the violative conduct for which the plaintiff sued did not continue uninterrupted, duress tolling did not apply. *See id.* at 406 ("The central question is whether [defendant's] tortious conduct spanned [the limitations period] and thus subjected [plaintiff] to a 'continuous wrong.'").

Mr. Combs's conduct for which Plaintiff sues — while indisputably odious — ceased in 2011 or 2012. Plaintiff does not allege that Mr. Combs committed any tortious conduct against her again in the twelve or thirteen years before she filed suit. Plaintiff was thus not subject to a continuous wrong, and duress tolling does not apply. *Cf. Kemp* v. *Regeneron Pharms., Inc.,* 117 F.4th 63, 71 (2d Cir. 2024) (explaining that plaintiff could not invoke New York's "continuing wrong doctrine simply by claiming that she continued to feel the effects of [her employer's] allegedly discriminatory act after [its commission]" because "that 'doctrine may only be predicated on continuing unlawful acts and *not on the continuing effects of earlier unlawful conduct*'" (emphasis added) (quoting *Henry* v. *Bank of Am.,* 48 N.Y.S.3d 67, 70 (1st Dep't 2017))).

But as mentioned, Plaintiff does not argue that Mr. Combs's tortious conduct continued after 2011 or 2012. Rather, either appealing to intuition or

17

overlooking the requirements of duress tolling, she argues that it was Mr. Combs's threats of retaliation if Plaintiff were to reveal his conduct that caused her duress and deterred her from timely filing.  In fairness, some courts appear to have engaged with this type of argument.  *See Gilmore*, 2025 WL 1425326, at *4; *Rivers* v. *Combs*, No. 25 Civ. 1726 (JSR), 2025 WL 2414117, at *6 (S.D.N.Y. Aug. 19, 2025); *Otis* v. *Combs*, No. 25 Civ. 1652 (LAP), 2026 WL 42492, at *4 (S.D.N.Y. Jan. 7, 2026); *Bianco*, 562 F. Supp. 3d at 533-34.  But even then, they overwhelmingly reject the contention that a defendant's threats of retaliation justify duress tolling.

Of the various other civil cases brought against Mr. Combs in this District, perhaps the most on point is *Otis*.  There, the court found tolling inappropriate even where the "crux" of the plaintiffs' argument was "that he was paralyzed with fear of Combs" due to specific murder threats and, further, that this fear "prevented [p]laintiff from seeking any legal recourse until Combs was in jail awaiting criminal trial."  *Otis*, 2026 WL 42492, at *4 (alterations adopted) (internal quotations marks and citation omitted).  Because the plaintiff in *Otis* had not alleged "*any* further contact, direct or otherwise, with Combs or his agents over the intervening thirteen-year period that preceded th[e] suit[,] [t]he lack of any subsequent contact with Combs" meant "that Plaintiff [could not] allege the requisite reasonable fear of retaliation to warrant tolling."  *Id.* at *5 (internal quotation marks and citation omitted) (analyzing duress as a species of equitable tolling).

18

So too here.  Even acknowledging that Mr. Combs's threats caused Plaintiff duress at the time they were made — and even setting aside that such threats are insufficient to invoke duress tolling under New York law because they were unrelated to the tortious conduct — at some point in the twelve to thirteen years since Mr. Combs made those threats, the duress they imposed on Plaintiff abated.  Indeed, the fact that Plaintiff was able to negotiate against Mr. Combs regarding *Deliver Me* — standing her ground on her desired artist's fee and refusing to yield even in the face of an "intimidating" voicemail from Mr. Combs (SAC ¶¶ 114-119) — supports the conclusion that Plaintiff's duress diminished.

Resisting this result, Plaintiff cites *Bianco*, 562 F. Supp. 3d 526, to argue that "[c]ourts have recognized that coercion's deterrent effects, particularly in abuse or trafficking cases, may persist long after the conduct ends." (Pl. Opp. 8).  *Bianco*, however, is immediately distinguishable because it is a Central District of California case that applies equitable estoppel to claims under California law, and not duress tolling to claims under New York law.  *See Bianco*, 562 F. Supp. 3d at 528, 533-34.  That said, the tolling standard in *Bianco* shares superficial similarities with New York's duress tolling standard.  *See id.* at 533.  And *Bianco*'s facts are similar as well: an influential defendant-musician threatened the "[p]laintiff's safety, immigration status, and career," which threats the plaintiff argued justified her delay in filing suit.  *Id.* at 534.  But *Bianco* is further distinguishable because Plaintiff in this case delayed filing suit for five years longer than the plaintiff in *Bianco* after the respective

final threats were made.  *See id.* at 531 (abuse ended in 2013 and plaintiff filed suit in 2021).  Thus, duress tolling does not salvage Plaintiff's expired claims.

### b.    Equitable Estoppel Does Not Revive Plaintiff's Claims

*Second*, Plaintiff invokes equitable estoppel, which saves otherwise time-barred state-law claims where "[i] the defendants 'induced [plaintiff] by fraud, misrepresentations or deception to refrain from filing a timely action'; [ii] plaintiff[ ] reasonably relied on the defendants' misrepresentations; and [iii] plaintiff[ ] exercised 'due diligence' in bringing the action 'within a reasonable period of time after the facts giving rise to the … equitable estoppel claim have ceased to be operational.'"  *Roeder* v. *J.P. Morgan Chase & Co.*, No. 21-552, 2022 WL 211702, at *2 (2d Cir. Jan. 25, 2022) (summary order) (final alteration in original) (quoting *Abbas* v. *Dixon*, 480 F.3d 636, 642 (2d Cir. 2007)).[4]  "Equitable estoppel is an extraordinary remedy" that "should be invoked sparingly and only under exceptional circumstances."  *Twersky* v. *Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y.) (internal quotations marks and citation omitted), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (summary order).

Plaintiff, however, does not plead fraud, misrepresentation, or deception on the part of Mr. Combs or Mr. Pierre; rather, she alleges that the threats to her physical safety and life deterred her from timely filing suit.  (Pl. Opp. 4

---

[4]    To articulate this standard, Plaintiff offers only New York cases. (Pl. Opp. 4 (citing cases from the Second Circuit, the Southern District of New York, and the New York Court of Appeals)).  Thus, as with duress tolling, the Court analyzes equitable estoppel only under the standard set forth above — drawn from New York cases — even as applied to California state-law claims. *See Krumme*, 238 F.3d at 138 (noting that the parties' "implied consent … is sufficient to establish choice of law" (internal quotation marks and citation omitted)).

("Combs' wrongdoing — including threats, violence, and psychological control — cultivated an environment of pervasive fear and intimidation that led Plaintiff to reasonably believe that any action other than silence and compliance would endanger herself and her family" and that resulted in "[h]er delay in filing.")).[5]

It is unclear whether a defendant's threats or other misconduct beyond fraud, misrepresentations, and deception may trigger equitable estoppel. In older cases, the Second Circuit has characterized the doctrine as encompassing "deception, concealment, threats, or other misconduct." *Overall*, 52 F.3d at 404 (quoting *Zoe G.* v. *Frederick F.G.*, 617 N.Y.S.2d 370, 371 (2d Dep't 1994)). Courts in this District have followed suit and included threats as part of the standard, even recently. *Roeder* v. *J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 616 (S.D.N.Y. 2021) (quoting *Overall*, 52 F.3d at 404), *aff'd*, No. 21-552, 2022 WL 211702 (2d Cir. Jan. 25, 2022) (summary order). Significantly, however, the Second Circuit, in its own more recent cases, has excluded threats from the standard and listed just "fraud, misrepresentations or deception" as possible forms of wrongful inducement. *Abbas*, 480 F.3d at 642 (quoting *Doe* v. *Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 568 (3d

---

[5] Plaintiff appears to make one allegation sounding in fraudulent inducement. (SAC ¶ 81 ("While forcibly groping her body, Mr. Combs coerced [Plaintiff] with fraudulent promises that he would ensure her professional success if she complied.")). The Court does not understand Plaintiff to argue that this allegation should equitably estop Mr. Combs from invoking a statute of limitations defense. Instead, the conduct that Plaintiff argues should trigger equitable estoppel is Mr. Combs's and Mr. Pierre's threats of retaliation against Plaintiff were she to report their misdeeds.

21

Dep't 2005), and *Kotlyarsky* v. *N.Y. Post*, 757 N.Y.S.2d 703, 706 (N.Y. Sup. Ct. 2003)); *Roeder*, 2022 WL 211702, at *2.

The Second Circuit's more recent exclusion of "threats" appears to be intentional. In *Geiss* v. *Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156 (S.D.N.Y. 2019), the district court summarized the uncertainty in the doctrine and concluded that fear of retaliation (a natural corollary of a threat) may serve as a basis for equitable estoppel in the context of litigation by prison inmates. *Id.* at 172-73. The district court in *Roeder* also acknowledged this tension: it cited *Geiss* as recognizing "threats or other misconduct" as only "*possible* forms of wrongful inducement." *Roeder*, 523 F. Supp. 3d at 616 (emphasis added) (quoting *Geiss*, 383 F. Supp. 3d at 172). Nevertheless, despite *Geiss*'s recognition — and *Roeder*'s repetition — of the doctrinal uncertainty, the Second Circuit, in affirming the district court in *Roeder* by summary order, avoided the tension. It chose to define equitable estoppel as including only inducement by "fraud, misrepresentations or deception." *Roeder*, 2022 WL 211702, at *2 (quoting *Abbas*, 480 F.3d at 642). Summary order or not, this Court doubts that the Second Circuit in *Roeder* missed the district courts' discussions of the uncertainty; rather, the Court believes the Second Circuit chose to fall back on its own more recent precedent, *Abbas*, 480 F.3d at 642. *See generally United States* v. *Payne*, 591 F.3d 46, 58 (2d Cir. 2010) ("[D]enying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases.").

That choice makes sense, particularly considering New York state courts' discussion of the equitable estoppel doctrine. The New York Court of Appeals appears not to include threats in its recitations of the equitable estoppel standard. *See Simcuski* v. *Saeli*, 44 N.Y.2d 442, 448-49 (1978) ("fraud, misrepresentations or deception"); *Zumpano* v. *Quinn*, 6 N.Y.3d 666, 674 (2006) (quoting *Simcuski*, 44 N.Y.2d at 449) (same). Admittedly, New York's intermediate appellate courts seem split. *Compare Hoffman* v. *Hoffman*, 556 N.Y.S.2d 608, 609 (1st Dep't 1990) ("fraud, misrepresentation, threat, or deception"), *and Zoe G.*, 617 N.Y.S.2d at 371 ("deception, concealment, threats or other misconduct"), *with Doe* v. *Holy See (State of Vatican City)*, 793 N.Y.S.2d at 568 ("fraud, misrepresentations or deception"). But the lower courts' inconsistency is ultimately of no moment, because the New York Court of Appeals is the final authority on this issue. *Riley* v. *Kennedy*, 553 U.S. 406, 425 (2008) ("A State's highest court is unquestionably the ultimate expositor of state law." (alteration adopted) (internal quotation marks and citation omitted)). Thus, recent descriptions of the equitable estoppel standard by both the New York Court of Appeals and the Second Circuit exclude threats from the list. Still, this Court need not hang its hat on a list of words used perhaps only to illustrate a broader doctrine. The basic principles underpinning the doctrine also show why threats do not trigger equitable estoppel.

Fundamentally, a defendant is equitably estopped from asserting the statute of limitations as an affirmative defense where the plaintiff's delay in filing is the result of the defendant's "affirmative wrongdoing." *Zumpano*, 6

23

N.Y.3d at 673 (quoting *General Stencils* v. *Chiappa,* 18 N.Y.2d 125, 128 (1966)). In other words, a defendant is equitably estopped from asserting a statute of limitations defense "precisely because her affirmative conduct in concealing the crime prevented plaintiff from timely bringing its action." *Id.* at 674. For example, a defendant serving as the plaintiff's head bookkeeper who steals from her employer and then conceals her theft for several years by misrepresenting the state of plaintiff's finances is equitably estopped from invoking a statute of limitations defense. *Id.* (citing *General Stencils,* 18 N.Y.2d at 128). But a defendant who "inflict[s] some type of injury upon a knowing plaintiff but fail[s] to come forward with further information about his or her wrongdoing" is not, such as in the case of priests who abuse victims but then take no further action — either to conceal or reveal. *Id.*

Thus, the rule the Court of Appeals has crafted provides that a defendant's affirmative conduct triggers equitable estoppel when it is designed to conceal his wrongdoing from a plaintiff and prevent that plaintiff from bringing suit. Absent concealment or deception, mere wrongdoing does not invoke the doctrine. *See Zumpano*, 6 N.Y.3d at 674 (rejecting as too "broad[ ]" the argument that equitable estoppel means "defendants cannot be permitted to benefit from their own wrongdoing").

In this case, Mr. Combs's and Mr. Pierre's threats were undoubtedly intended to discourage Plaintiff from unveiling their misdeeds and holding them to account. But the threats themselves did not conceal Defendants' misdeeds from Plaintiff; if anything, they made her more aware. Those threats

24

therefore do not trigger equitable estoppel.  Instead, Plaintiff's arguments that the threats deterred her from timely filing fit more naturally within the rubrics of duress or equitable tolling, doctrines that the Court elsewhere explains do not salvage Plaintiff's claims.[6]

### c.    Equitable Tolling Does Not Revive Plaintiff's Claims

*Third*, Plaintiff seeks shelter under equitable tolling, a doctrine that gives a court discretion to toll the statute of limitations for federal claims if a plaintiff establishes "[i] that [s]he has been pursuing h[er] rights diligently, and [ii] that some extraordinary circumstance stood in h[er] way and prevented timely filing."  *Menominee Indian Tribe of Wisc.* v. *United States*, 577 U.S. 250, 255 (2016) (quoting *Holland* v. *Florida*, 560 U.S. 631, 649 (2010)); *see also Roeder*, 523 F. Supp. 3d at 617; *Doe* v. *United States*, 76 F.4th 64, 71 (2d Cir. 2023). "Courts in this Circuit apply the doctrine of equitable tolling 'only in rare and exceptional circumstances[.]'"  *Stone #1* v. *Annucci*, No. 20 Civ. 1326 (RA), 2021 WL 4463033, at *11 (S.D.N.Y. Sept. 28, 2021) (quoting *Walker* v. *Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005)).

Regarding the second element, "[t]he term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the

---

6    Despite the Court's above analysis, it recognizes that the law is unclear as to whether threats trigger equitable estoppel.  Even if threats did trigger the doctrine, though, that would only mean that equitable estoppel should be analyzed like duress or equitable tolling.  (*See* Def. Br. 12 (arguing that "[t]o the extent equitable estoppel may be based on a defendant's threats (and recent cases suggest that it cannot … ), the doctrine does not apply unless there is a 'pattern of continual and egregious acts of intimidation.'" (quoting *Geiss* v. *Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 175 (S.D.N.Y. 2019)))).  Such an analysis would lead to the same eventual conclusion — that no tolling doctrine saves Plaintiff's claims.

obstacle impeding compliance with a limitations period." *Harper* v. *Ercole*, 648 F.3d 132, 137 (2d Cir. 2011). "Among the extraordinary reasons that may justify equitable tolling of a statute of limitations is a defendant's efforts to threaten or retaliate against a plaintiff if she files a claim against him." *Doe*, 76 F.4th at 72 (quoting *Clark* v. *Hanley*, No. 18 Civ. 1765 (JAM), 2022 WL 124298, at *4 (D. Conn. Jan. 13, 2022)). Thus, "years of violent sexual abuse and threats to [a plaintiff's] life" may give the plaintiff a "'specific and credible basis to fear retaliation' from [the defendant] and thereby constitute[ ] an extraordinary circumstance." *Id.* (quoting *Stone #1*, 2021 WL 4463033, at *12). Likewise, "the psychological impact of long-term or extreme sexual abuse can constitute an extraordinary circumstance that prevents a victim from coming forward even for some time after the abuse has ceased." *Id.*

Plaintiff argues that Mr. Combs's and Mr. Pierre's threats against her present an extraordinary circumstance excusing her delayed filing. To be sure, her allegations match up well with the above legal standards. But the Court's review of the case law ultimately persuades it that Plaintiff is not entitled to equitable tolling.

Fear of retaliation can constitute an extraordinary circumstance that justifies equitable tolling only in very narrow circumstances, by measuring "the effect of a threat [of retaliation]" based on "factors including the nature of the threat and the relative power of its source and its target." *Doe*, 76 F.4th at 72. To illustrate, a correction officer's "substantial control" over an inmate can warrant equitable tolling, as can an Immigration and Customs Enforcement

26

("ICE") officer's power over an undocumented immigrant whom he has manipulated with threats of deportation, rape (leading to three aborted pregnancies), and physical abuse. *Davis* v. *Jackson*, No. 15 Civ. 5359 (KMK), 2016 WL 5720811, at *11 (S.D.N.Y. Sept. 30, 2016) (explaining that because "a correctional officer controls an inmate's life inside of prison, ... the specter of retaliation[ ] [is] a real and ever-present force in an inmate's life" (internal quotation marks and citation omitted)); *Doe*, 76 F.4th at 68-69, 72 ("Sexual abuse perpetrated by an ICE agent against an undocumented immigrant may give the assailant's threats a similarly immobilizing effect as those of a prison official against someone in their custody."). At the same time, threats of retaliation against a prison inmate who is on supervised release do not rise to the level of extraordinary circumstances. *Stone #1*, 2021 WL 4463033, at *12 (holding that after release from prison, plaintiff "was no longer under the 'substantial control' of the defendant correction officers and supervisory officials, and thus no longer subject to the 'unique psychological environment' of incarceration" meriting equitable tolling (quoting *Davis*, 2016 WL 5720811, at *10)). Nor do threats of retaliation in the employment discrimination context. *Davis*, 2016 WL 5720811, at *9.

In this case, Mr. Combs and Mr. Pierre may well have exercised the requisite power over Plaintiff during their time working together, but the Court finds that this power dissipated in the more than ten years between Plaintiff's last interactions with these defendants and the filing of her lawsuit. *See Stone #1*, 2021 WL 4463033, at *12 (concluding that once inmate was released from

27

prison, officer did not exercise substantial control over her justifying equitable tolling).  That is, at some point in this decade-plus period, the statutes of limitations began to run.  Such a dissipation of power over Plaintiff means equitable tolling is no longer appropriate.

To argue that Mr. Combs's and Mr. Pierre's power did not dissipate, Plaintiff invokes *Doe*, 76 F.4th 64, and argues that the decade-long shadow of intimidation cast by their threats should preserve her claims.  (Pl. Opp. 9-12). It is true that in *Doe* the Second Circuit held that an ICE officer's threats of retaliation could constitute "an extraordinary circumstance [that] continued to stand in [the plaintiff's] way even after [the officer] and [plaintiff] were no longer in communication."  *Doe*, 76 F.4th at 72.  But *Doe* is distinguishable on the other prong of the equitable tolling analysis: whether plaintiff pursued her rights diligently.  *See Menominee Indian Tribe of Wisc.*, 577 U.S. at 255.  *Doe* held that the record supported the conclusion that the plaintiff "beg[a]n seeking redress … as soon as she was able to."  *Doe*, 76 F.4th at 73.  But the time between the expiration of the *Doe* plaintiff's claims and the commencing of her suit ranged from seven to nineteen months.  *See id.* at 69-71.  Here, in contrast, Plaintiff waited more than a decade for most her of claims.  While the serious threats against Plaintiff could excuse some delay, under the facts alleged in the SAC, ten-plus years is too long to constitute reasonable diligence. *See Otis*, 2026 WL 42492, at *5 (declining to equitably toll plaintiff's claims, despite Mr. Combs's "position of considerable power and influence in the media industry at large," because the plaintiff had not alleged "*any* further contact,

28

direct or otherwise, with Combs or his agents over the intervening thirteen-year period that preceded this suit," or any "specific allegations as to how Combs would have controlled [the plaintiff's] life and safety at an individual level" (internal quotation marks and citation omitted)); *cf. Stone #1*, 2021 WL 4463033, at *12 ("[T]he trauma of sexual abuse, particularly by one's jailors, can and often does persist for many years," but "a plaintiff's experience of trauma, even significant trauma, cannot on its own legally justify the potentially indefinite tolling of a statute of limitations.").

In view of the important purposes served by statutes of limitations and the rare and exceptional circumstances in which equitable tolling applies, the Court holds that at some point in the twelve to thirteen years between the end of Plaintiff's interactions with Mr. Combs and Mr. Pierre and the filing of her suit, these defendants' power and control over Plaintiff dissipated such that she was not diligent in pursuing her rights.  *See Rivers*, 2025 WL 2414117, at *4 ("[T]he many positive purposes served by statutes of limitations" include the promotion of "justice by preventing surprises through plaintiffs' revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared" … and "the need to protect the judicial system from the burden of adjudicating stale and groundless claims.'" (first quoting *CTS Corp.* v. *Waldburger*, 573 U.S. 1, 8-9 (2014); then quoting *Duffy* v. *Horton Mem'l Hosp.*, 66 N.Y.2d 473, 476-77

29

(1985))).[7]  For all of these reasons, the Court dismisses Counts Two through Sixteen as time-barred.

### 2.    Plaintiff Fails to State Claims for Copyright Infringement

In Count Seventeen, Plaintiff alleges copyright infringement against Mr. Combs and Love Records, Inc., and in Count Eighteen she alleges vicarious or contributory copyright infringement against Mr. Combs, Love Records, Inc., Janice Combs Publishing LLC, and Janice Combs Publishing Holdings Inc. (SAC ¶¶ 224-237).  These claims rest on the premise that those Defendants released *Deliver Me* without Plaintiff's consent and without properly compensating her.  (*Id.* ¶¶ 226-229, 232-236).

At the outset, Plaintiff's direct infringement claim under Count Seventeen fails "because coauthors cannot sue one another for copyright infringement." *Kwan* v. *Schlein*, 634 F.3d 224, 229 (2d Cir. 2011); *see also Cortner* v. *Israel*, 732 F.2d 267, 271-72 (2d Cir. 1984).  Plaintiff and Mr. Combs are co-authors of *Deliver Me*.  In her brief, Plaintiff argues otherwise (Pl. Opp. 21 (contending that Plaintiff and Mr. Combs have "distinct ownership rights")), but that is not what she pleaded (*see* SAC ¶¶ 108-110).  Moreover, *Deliver Me*'s copyright certificate of registration, for which Plaintiff herself applied, lists Plaintiff and

---

[7]    Plaintiff also relies on *Doe* v. *Warren & Baram Management LLC*, No. 20 Civ. 9522 (ER) (VF), 2024 WL 2941222 (S.D.N.Y. May 3, 2024), *report and recommendation adopted sub nom.*, *Doe* v. *Baram*, No. 20 Civ. 9522 (ER), 2024 WL 3342602 (S.D.N.Y. July 9, 2024), as an example of a court equitably tolling a statute of limitations where a powerful man with "a history of using his financial resources, political power, influence, and threats of force to intimidate his victims" deterred a plaintiff from timely filing.  (Pl. Opp. 10 (citing *Warren & Baram Mgmt. LLC*, 2024 WL 2941222)).  But this was a Report and Recommendation on a damages inquest against a defaulting corporation, and the Court declines to follow it here.

Mr. Combs as authors who were each responsible for identical creations: "music, lyrics, [and] musical arrangement." (Dkt. #130-1). This was a thoughtful and intentional description; the registration lists the other three authors as creating only "music [and] lyrics" or just "music." (*Id.*).[8] Because Plaintiff and Mr. Combs are co-authors of *Deliver Me*, she cannot allege copyright infringement against him.

Plaintiff tacitly concedes this general rule and instead argues for two "[e]xceptions to [c]o-[a]uthor [i]mmunity." (Pl. Opp. 20). *First*, she argues that Mr. Combs granted an exclusive license to his record label and publishing companies, which violated copyright law. (*Id.*). But Plaintiff did not plead that Mr. Combs conveyed an exclusive license (*see* SAC ¶¶ 100-122), and in any event, it is generally not possible under copyright law for him to do so without her permission. As a co-author, Mr. Combs has the right only to non-exclusively license *Deliver Me*. *Davis* v. *Blige*, 505 F.3d 90, 100 (2d Cir. 2007) ("A co-owner may grant a *non-exclusive* license to use the work unilaterally, because his co-owners may also use the work or grant similar licenses to other users and because the non-exclusive license presumptively does not diminish the value of the copyright to the co-owners."); *Gasery* v. *Kalakuta Sunrise, LLC*,

---

[8]     The *Deliver Me* copyright certificate of registration was attached as an exhibit to Plaintiff's First Amended Complaint but not to the operative SAC. (*Compare* Dkt. #130, *with* SAC). While "an amended complaint ordinarily supersedes the original, and renders it of no legal effect," *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotations marks and citation omitted), the Court may nonetheless take judicial notice of the certificate of registration, *see TCA Television Corp.* v. *McCollum*, 839 F.3d 168, 172 (2d Cir. 2016) (acknowledging that, on motion to dismiss, courts may take judicial notice of copyright registrations).

31

422 F. Supp. 3d 807, 817 (S.D.N.Y. 2019); *Jasper* v. *Sony Music Ent., Inc.*, 378 F. Supp. 2d 334, 346 (S.D.N.Y. 2005); *Werbungs Und Commerz Union Austalt* v. *LeShufy*, No. 84 Civ. 7393 (PNL), 1987 WL 33618, at *1 (S.D.N.Y. Dec. 24, 1987).  The Court therefore rejects Plaintiff's exclusive license argument.

*Second*, Plaintiff makes an argument that the Court construes as an assertion that Defendants failed to compensate her for *Deliver Me*'s commercial success.  (*See* Pl. Opp. 20-22).  But Plaintiff pleads her claims as violations of the Copyright Act, 17 U.S.C. § 106 (SAC ¶¶ 224-237), and such claims cannot support relief because the alleged duty to share proceeds arises not from the Copyright Act but from the parties' co-ownership relationship.  *See Lindsay* v. *Wrecked & Abandoned Vessel R.M.S. TITANIC*, No. 97 Civ. 9248 (HB), 1999 WL 816163, at *7 (S.D.N.Y. Oct. 13, 1999).  Any such claim instead sounds in accounting, contract, unjust enrichment, or similar state-law or equitable theories, none of which Plaintiff advances with respect to her allegations of copyright infringement.  *See id.*; *Weissmann* v. *Freeman*, 868 F.2d 1313, 1318 (2d Cir. 1989); *Blige*, 505 F.3d at 98; *Reach Music Pub., Inc.* v. *Warner/Chappell Music, Inc.*, No. 09 Civ. 5580 (LTS), 2009 WL 3496115, at *2 (S.D.N.Y. Oct. 23, 2009); *Ashton-Tate Corp.* v. *Ross*, 916 F.2d 516, 522 (9th Cir. 1990).

Plaintiff's secondary infringement claim under Count Eighteen depends on the underlying infringement in Count Seventeen.  *See Krisko* v. *Marvel Ent., LLC*, 473 F. Supp. 3d 288, 307 (S.D.N.Y. 2020) ("Although the Copyright Act does not expressly render anyone liable for infringement committed by another, federal common law imposes secondary liability on a party that has not directly

32

infringed a copyright, but has played a significant role in direct infringement committed by others." (alterations adopted) (internal quotations marks and citations omitted)).  Because Plaintiff has not alleged a direct infringement claim against Mr. Combs, her secondary infringement claim under Count Eighteen fails too.  In sum, the Court dismisses Counts Seventeen and Eighteen with prejudice because they fail to state claims for relief.

### 3. The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's Remaining Claim

That leaves Count One, the VGMVPL claim under New York City law, N.Y.C. Admin. Code §§ 10-1101 to 10-1107.  (*See* SAC ¶¶ 127-133).  The VGMVPL provides a two-year revival window for claims brought between March 2023 and March 2025 that are otherwise time-barred.  *See* N.Y.C. Admin. Code § 10-1105(a).  Recently, however, the Second Circuit certified to the New York Court of Appeals the question of whether other New York laws — the Child Victims Act, N.Y. C.P.L.R. § 214-g, and the Adult Survivors Act, N.Y. C.P.L.R. § 214-j — preempt the VGMVPL's revival window.  *Parker* v. *Alexander*, 171 F.4th 146, 148 (2d Cir. 2026); *see also Parker* v. *Alexander*, 45 N.Y.3d 951 (2026) (accepting certified question).  The parties debate this issue (Def. Br. 13-15; Pl. Opp. 23-24 (arguing that Plaintiff has advanced VGMVPL theories that would not be preempted, regardless of *Parker*'s outcome); Def. Reply 6), and some courts in this District have opted to stay proceedings as to VGMVPL claims while *Parker* is pending, *e.g.*, *Rivers*, 2025 WL 2414117, at \*9, or to resolve such claims on other grounds, *see Withers* v. *Combs*, No. 24 Civ. 8852

33

(JPC), 2026 WL 866837, at *1 (S.D.N.Y. Mar. 30, 2026) (dismissing VGMVPL claim because the plaintiff failed to plausibly allege gender animus element).

This Court need not wade into those waters, because it declines to exercise supplemental jurisdiction over Count One. *See Otis*, 2026 WL 42492, at *6 (rejecting all federal law claims against Mr. Combs and declining to exercise supplemental jurisdiction over remaining state and local law claims). Count One is a claim under New York City law, and the "Second Circuit takes a particularly strong view that district courts should decline to exercise supplemental jurisdiction in the absence of a 'clearly articulated federal interest.'" *Cummings* v. *City of New York*, No. 19 Civ. 7723 (CM), 2021 WL 1664421, at *2 (S.D.N.Y. Apr. 28, 2021) (quoting *Kolari* v. *N.Y. Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006)); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the claim raises a novel or complex issue of State law" or "the district court has dismissed all claims over which it has original jurisdiction[.]"); *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726, 86 (1966) ("Certainly, if the federal claims are dismissed before trial, … the state claims should be dismissed as well.").

Here, no circumstances counsel in favor of the Court's exercising supplemental jurisdiction over Count One, and factors of convenience, fairness, and comity do not require the Court to exercise supplemental jurisdiction. Accordingly, the Court dismisses Count One without prejudice to its renewal in an appropriate state court.

## CONCLUSION

The Court's resolution of the instant motion exists independently of its disapprobation of the factual allegations, which, if true, are execrable. The Court is, of course, compelled to follow the law. For the foregoing reasons, Defendants' motion to dismiss is GRANTED. The Court dismisses Count One without prejudice, and Counts Two through Eighteen with prejudice. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     June 12, 2026
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

35